**2018 UT App 146**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BRIAN SCOTT REID,
Appellant.

Opinion
No. 20160397-CA
Filed July 27, 2018

Third District Court, Salt Lake Department
The Honorable James T. Blanch
No. 151906548

Deborah L. Bulkeley, Attorney for Appellant

Sean D. Reyes and Kris C. Leonard, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES GREGORY K. ORME and JILL M. POHLMAN concurred.

HAGEN, Judge:

¶1      Brian Scott Reid appeals his convictions for rape, forcible sodomy, forcible sexual abuse, and tampering with a witness. On appeal, he raises multiple issues that he did not preserve at trial. Because Reid has failed to establish a claim of ineffective assistance of counsel or plain error, we affirm.

## BACKGROUND

¶2      The victim, K.R., lived in her grandmother's house, along with other family members including her uncle, Reid. Due to a learning disability, K.R. had been enrolled in special education classes until she finished high school. At twenty-three years old, K.R. did not have a job but helped her grandmother with

household chores. K.R.'s bedroom was located in the basement, down the hall from the room Reid shared with his wife.

¶3     At trial, K.R. testified that Reid sexually assaulted her in her bedroom. She was folding clothes and watching a movie when Reid walked in and said, "[L]et's see what my teddy bear feels like." K.R. testified that Reid grabbed her, pushed her onto her bed, and lay down beside her. K.R. asked him what he was doing and "told him nicely to please get out," but Reid told her his back hurt and he just needed to relax. Reid then slipped his hands underneath her shirt and bra and grabbed her breasts. K.R. told him to stop, but Reid whispered, "Be quiet or I'm going to harm you."

¶4     According to K.R., Reid then grabbed her by her legs and pulled her to the foot of the bed. He pulled down her pants and underwear, held her down with his hands on her thighs, and licked her "down there." She told him to stop and tried to push herself up, but he was holding her down with his weight and told her to be quiet. Reid then coated his penis with lotion and had inserted it "halfway" into her vagina when K.R. managed to push him away. K.R. told Reid to get out of her room and he left, but only after he threatened to harm her if she told anyone about the assault.

¶5     The next day, K.R. decided she needed to tell her grandmother what Reid had done. After K.R. told her about the sexual assault, her grandmother called Reid's wife upstairs so that K.R. could tell her what had happened. Reid's wife immediately drove K.R. and her grandmother to the police station where K.R. reported the sexual assault. The police talked to K.R. for a short time then instructed her to go to the hospital for a sexual-assault examination.

¶6     At the hospital, K.R. told the examining nurse that Reid had grabbed her, laid her on the bed, and then lay down beside her and "started doing uncomfortable things." She stated that Reid had pulled down her pants and underwear and grabbed

her breasts "really hard" under her clothes. K.R. said she told Reid to stop, but he threatened to hurt her if she screamed. K.R. told the nurse that Reid "shoved his dick inside" her, but she pushed him off. Before he left the room, however, Reid threatened to harm her if she told anyone. In response to the nurse's specific questions, K.R. stated that there had been penetration, that lotion had been used as lubrication, and that Reid's mouth had been in contact with her genitalia.

¶7     After gathering this information, the nurse conducted a physical examination. The nurse noted and photographed a blue and purple circular bruise on K.R's left outer thigh. The bruise measured 2.5 centimeters, consistent with the size of a fingertip. Photographs from the pelvic examination also revealed some redness at the entrance to K.R.'s vagina. The nurse testified that her findings during the physical examination were consistent with the information K.R. disclosed about the assault.

¶8     During the examination, the nurse also collected separate swabs for testing from the external parts of K.R.'s genitalia, referred to as the vulvar, and from inside her vagina. Both the vulvar swabs and the vaginal swabs tested positive for the presence of saliva as well as male DNA that matched Reid's profile.[1]

---

1. In briefing and at oral argument, the State suggested that the DNA came from semen found on K.R.'s body during the examination. There is no evidence that any semen, let alone semen matching Reid's DNA profile, was detected. The vaginal swab tested negative for the presence of a protein found in semen, and the vulvar swab was inconclusive. Given the inconclusive result, the DNA from the vulvar swab was processed using a specific extraction method designed to separate sperm cells from epithelial (skin) cells. The laboratory technician testified that the DNA matching Reid's profile was found in the "epithelial faction" of the vulvar swab. There was

(continued…)

¶9    Two detectives were assigned to the case and spoke briefly with K.R. immediately after her examination. The detectives told her not to return home until Reid was out of the house. With the help of the Legal Aid Society of Salt Lake, K.R. later petitioned for and received a protective order against Reid to keep him away from her grandmother's house.

¶10    Detectives interviewed Reid later that day. Reid initially told the detectives that he did not know why he was being interviewed and could not remember what had happened the day before. Reid denied having any interaction with K.R. on the date of the alleged sexual assault, but he later recalled speaking with her in the hallway outside of his bedroom. He maintained that he did not go into K.R.'s room and did not have any sexual relations with her. He told the detectives that his wife suspected him of having an affair and was "setting him up" by having K.R. make false accusations.

¶11    The following week, detectives formally interviewed K.R. During this interview, K.R. mentioned the use of lotion and the fact that she had been watching a movie at the time of the assault. K.R. also pointed out that she had developed additional bruises on her legs since the assault, which the detectives then photographed. At trial, K.R. testified that some of the bruising shown in the photographs occurred earlier from an unrelated incident, but that the remaining bruises had not been there before the sexual assault. She testified that the new bruises were in the same place where Reid had grabbed her legs to pull her to the end of the bed.

¶12    During direct examination at trial, Reid admitted that he had a sexual encounter with K.R. on the day in question, but he claimed that the encounter was consensual. Reid testified that

---

(…continued)

no testimony as to whether any sperm cells were successfully extracted.

K.R. had invited him into her room to watch a movie and that they had started talking about relationships. While watching a sex scene in the movie, they became intimate and Reid licked his finger and rubbed the outside of K.R.'s vagina. Reid then suggested that they use lubricant, and she told him to get the lotion. Reid stated that he touched his penis to K.R.'s vagina, then stopped and said, "I don't think we should be doing this." He then left the room.

¶13    Reid admitted that he initially lied to police. However, he claimed that he could not think clearly at the time because he "had taken a bunch of medication" before that interview and was afraid after being accused of "taking liberties" with K.R. According to Reid, the first time he met his attorney, he had told his attorney the same story he told the jury.

¶14    On cross-examination, the State questioned Reid about a recorded telephone call he had made to his wife from jail. During the conversation with his wife, Reid said he had told his attorney that his bank records would prove that he was at a motel on the day of the alleged sexual assault and could not have committed the crime. When confronted with this information, Reid testified that he had been lying to his wife at that time and that he had never told his attorney that story.

¶15    The jury convicted Reid as charged for one count each of rape, forcible sodomy, forcible sexual abuse, and witness tampering. Reid appeals.

ISSUES AND STANDARDS OF REVIEW

¶16    On appeal, Reid raises six grounds for reversal, none of which were preserved. "When a party fails to raise and argue an issue in the trial court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443. Our supreme court "has recognized three distinct exceptions to preservation: plain error, ineffective assistance of

counsel, and exceptional circumstances." *Id.* ¶ 19. "When an issue is not preserved in the trial court, but a party seeks to raise it on appeal, the party must establish the applicability of one of these exceptions to persuade an appellate court to reach that issue." *Id.*

¶17 As to the first three issues, Reid argues the ineffective-assistance-of-counsel exception to the preservation rule. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).

¶18 As to the second set of issues, which he labels as "prosecutorial misconduct" claims, Reid asserts both the ineffective-assistance-of-counsel and plain-error exceptions to the preservation requirement. To establish plain error, a defendant must "show the existence of a harmful error that should have been obvious to the district court." *State v. Ringstad*, 2018 UT App 66, ¶ 32 (quotation simplified).

ANALYSIS

I. Ineffective-Assistance-of-Counsel Claims

¶19 Reid argues that his attorney rendered constitutionally ineffective assistance in three ways: (1) by failing to provide context to the evidence surrounding the protective order, (2) by opening the door to the admission of the jail call between Reid and his wife, and (3) by stipulating to allegedly erroneous jury instructions. To prevail on an ineffective-assistance-of-counsel claim, a defendant must show both "that counsel's performance was objectively deficient," and "a reasonable probability exists that but for the deficient conduct defendant would have obtained a more favorable outcome at trial." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162; *see Strickland v. Washington*, 466 U.S. 668,

687 (1984). A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel. *See id.* at 700; *see also State v. Goode*, 2012 UT App 285, ¶ 7 n.2, 288 P.3d 306 ("Because both prongs of the *Strickland* test must be met to establish ineffective assistance of counsel, we need not always address both prongs.").

¶20    In this case, we do not consider the adequacy of counsel's performance, because Reid has failed to establish prejudice. To demonstrate prejudice, "[a] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Here, even assuming defense counsel performed deficiently, Reid has not shown "that absent counsel's errors, he had a reasonable chance to prevail." *See State v. Taylor*, 947 P.2d 681, 685 (Utah 1997).

A.    Introduction of the Protective Order

¶21    Reid claims that his attorney performed deficiently in eliciting testimony that K.R. had obtained a protective order against Reid following the assault. Reid's attorney cross-examined K.R. about the protective order in an effort to show that, in her petition, she had omitted important details describing her interaction with Reid. On appeal, Reid claims that his attorney should have made clear to the jury that Reid stipulated to the issuance of the protective order without admitting guilt and that there had been no judicial finding that the assault occurred.

¶22    Reid cannot establish that his trial counsel's handling of the protective order resulted in prejudice, however, because there is no reasonable probability that the result would have been different had defense counsel offered additional context for the issuance of the protective order. Reid's prejudice argument is

based entirely on his assertion that "this is not a case with strong evidence" of guilt. We disagree with that assessment.

¶23 The State presented compelling evidence of Reid's guilt. In contrast to K.R.'s testimony, which was largely consistent with her prior statements, Reid repeatedly lied about the assault. When initially interviewed, Reid told police that he did not know why he was being interviewed, could not remember what had happened the day before the interview, and had no contact with K.R. on the day in question. He later admitted to having a brief interaction with K.R. in the hallway outside his bedroom. However, he repeatedly denied having any sexual relations with K.R. or even entering her bedroom. Additionally, he later told his wife that he could not have committed the alleged assault, because he had been at a motel at the time. Not until trial, when faced with the DNA test results, did he admit to having sexual contact with K.R., claiming it was consensual.

¶24 In addition to admitting that his earlier statements were false, Reid's final version of events was inconsistent with the physical evidence. He testified that he had only rubbed the outside of K.R.'s vagina with his finger and had briefly touched her with his penis. This story was inconsistent with the presence of his DNA on the vaginal swabs. The presence of Reid's DNA, not just on K.R.'s external genitalia but also inside her vagina, contradicted Reid's testimony at trial that he had never penetrated K.R.'s vagina, either with his finger or his penis.

¶25 Instead, the DNA evidence corroborated K.R.'s version of the sexual assault. K.R. testified that Reid grabbed her legs, held her down as he licked her vagina, and then penetrated her with his penis. This testimony was further corroborated by the bruising on K.R.'s legs, including the circular bruise noted by the nurse during K.R.'s examination, and redness at the entrance to K.R.'s vagina.

¶26 Taken together, the State presented strong evidence supporting K.R.'s version of events and challenging Reid's

credibility. In light of this evidence, Reid has failed to show that, absent his attorney's allegedly erroneous handling of the protective order, he "had a reasonable chance to prevail." *See State v. Taylor*, 947 P.2d 681, 685 (Utah 1997).

B.     Opening the Door to the Admission of the Jail Call

¶27     Reid claims that trial counsel's performance was deficient because he improperly elicited "testimony from [Reid] that opened the door for the State to impeach him by introducing into evidence his prior inconsistent statement to his wife." On direct examination, Reid's trial counsel asked whether testifying at trial was the first time that Reid had told anyone "what actually happened that day." Reid responded that, the first time he met his attorney, he had told him "everything" that "actually happened."

¶28     On cross-examination, the State sought to impeach this testimony by admitting a recorded jail phone call from Reid to his wife in which Reid claimed to have told his attorney that he could not have assaulted K.R., because he had bank records to prove that he was at a motel at the time. Reid admitted that he had lied to his wife during this phone conversation. But he repeatedly clarified, both during cross-examination and on redirect, that he never told his attorney about the false alibi. Instead, he testified that he lied to his wife when he claimed to have told his attorney that story. He reiterated that he had always told his attorney that he had a consensual sexual encounter with K.R.

¶29     Reid argues that the admission of the phone call "was highly prejudicial because it caused [his] testimony to appear inconsistent." Had Reid's statement to his wife been the only evidence that made his trial testimony appear inconsistent, this argument might carry more weight. However, the jury heard evidence of Reid repeatedly lying to the police, denying not only the sexual assault but any sexual contact with K.R. whatsoever.

Even without the evidence of the phone call, the jury was well aware that Reid had changed his story.

¶30   In addition, Reid's testimony made it abundantly clear that he never told his attorney the motel story and was lying to his wife when he said that he had. As Reid acknowledges, "It is not surprising that [he] would deny to his wife that he had a sexual encounter with another woman, but be frank about the encounter when discussing it with his attorney." We agree. The admission of the phone call did not undermine Reid's testimony that the story he told at trial was the same story he had always told his attorney.

¶31   Given the limited impact of this evidence and the strength of the State's case as described above, *see supra* ¶¶ 23–26, there is no reasonable probability that the jury would have reached a different verdict had defense counsel not opened the door to the admission of the phone call. Accordingly, Reid has failed to establish that he was prejudiced by his attorney's alleged error.

C.     Failure to Object to Jury Instructions

¶32   Reid further contends that defense counsel's "stipulation to the jury instructions was ineffective [because] they included circumstances of non-consent that were not supported by the evidence, confused the elements of forcible sodomy and forcible sexual abuse, and erroneously instructed on attempt." We do not reach the issue of whether the jury instructions accurately stated the law or whether defense counsel performed deficiently in failing to object, because Reid has failed to establish prejudice. *See State v. Garcia*, 2017 UT 53, ¶ 40 (explaining that "the United States Supreme Court [has] held that errors in jury instructions— even instructions going to the elements of a charged crime— require harmless-error analysis" (citing *Neder v. United States*, 527 U.S. 1, 15 (1999))).

¶33   First, Reid argues that instruction 37 included statutory variants for proving lack of consent that were inapplicable to the

facts of this case. Utah Code section 76-5-406 lists twelve circumstances under which an individual commits a sexual offense "without the consent of the victim." In this case, the court instructed the jury as to the first five statutory circumstances:

1. K.R. expressed lack of consent through words or conduct;

2. BRIAN REID overcame K.R. through application of physical force or violence;

3. BRIAN REID overcame K.R. through concealment or by the element of surprise;

4. BRIAN REID coerced K.R. to submit by threatening immediate or future retaliation against K.R. or any person, and K.R. thought at the time that BRIAN REID had the ability to carry out the threat;

. . .

[5]. K.R. did not consent and BRIAN REID knew K.R. was unconscious, unaware that the act was occurring, or was physically unable to resist.

¶34    Reid claims that the jury should not have been instructed on the third or fifth variant, because those circumstances were inapplicable to the facts of this case. In response, the State argues that the evidence potentially supported a finding of guilt under either variant. The State argues that, under the third variant, the jury could have reasonably found that Reid overcame K.R. through surprise by unexpectedly grabbing her and pushing her onto the bed. Under the fifth variant, the State argues that the jury could have reasonably found that K.R. was physically unable to resist given her testimony regarding the size disparity and her inability to push Reid off of her when he was holding

her down with his weight. But the State concedes there is no evidence to suggest either concealment or that K.R. was unconscious or otherwise unaware that the assault was occurring.

¶35 Even assuming that defense counsel performed deficiently in failing to object to the inclusion of arguably inapplicable circumstances, Reid has not demonstrated prejudice. Our supreme court recently noted the "settled means of assessing the effect of a superfluous jury instruction." *State v. Hummel*, 2017 UT 19, ¶ 83, 393 P.3d 314. The court explained that there is "no need to reverse a conviction even if there were erroneous instructions on one variation of a crime submitted to the jury where the evidence overwhelmingly supports a conviction under another variation." *Id.* ¶ 83 n.30 (quotation simplified); *see also State v. Ojeda*, 2015 UT App 124, ¶ 6 n.1, 350 P.3d 640 ("Inclusion of the inapplicable language from the statute did not prejudice Defendant, as the jury heard no evidence consistent with [the superfluous variant] but ample evidence bearing on the other statutory variants.").

¶36 Here, the evidence overwhelmingly supported a conviction under the first, second, or fourth circumstances. The evidence established that K.R. "expressed lack of consent through words or conduct" when she repeatedly told Reid to stop; that Reid "overcame K.R. through application of physical force or violence" when he grabbed her, pushed her onto the bed, and held her down while he performed oral sex; and that Reid "coerced K.R. to submit by threatening" her with harm if she screamed or told anyone. *See* Utah Code Ann. § 76-5-406(1), (2), (4) (LexisNexis 2017). Given the ample evidence supporting these three variants, there is no reasonable probability that the jury's verdict would have been different even if the arguably superfluous circumstances had been excluded.

¶37 Second, Reid argues that instructions 33 and 34 on forcible sodomy and forcible sexual abuse, respectively, "did not clarify that the crimes had different and distinct elements,"

thereby allowing the jury to convict Reid of "both crimes [based] on the same conduct or for conduct for which there was no evidence." At trial, the State presented evidence of three distinct sexual offenses: rape, forcible sodomy, and forcible sexual abuse. In closing argument, the prosecutor emphasized that "the forcible sodomy is when the defendant licked [K.R.'s] vagina" and "forcible sexual abuse" occurred when Reid "touched K.R.'s breast." The prosecutor went on to detail the separate evidence in support of each count. K.R.'s testimony that Reid held her down while "he started to lick [her] down there" and the positive tests for saliva and Reid's DNA "inside the vagina itself" supported the forcible sodomy charge. And K.R.'s testimony that Reid "grabbed her breasts so hard under her shirt and bra touching skin to skin" supported the forcible sexual abuse charge. Even if the instructions were construed in a way to permit a conviction on both counts based on the same conduct, there is no reasonable probability that the jury erroneously convicted Reid in that manner given the way the case was presented.

¶38     Third, Reid argues instruction 39 defined "attempt" without clarifying the charge to which it pertained and that the jury "could have thought it applied to the sexual offenses and convicted [Reid] of those based on attempt." Given the evidence in this case, including laboratory tests showing the presence of saliva and Reid's DNA both on the exterior and inside of K.R.'s vagina, there is no reasonable probability that the jury convicted Reid without concluding that he had completed the charged sexual offenses.

¶39     Reid has failed to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). Because we conclude that Reid suffered no prejudice as a result of his defense counsel's alleged errors, his claim of ineffective assistance of counsel fails.

II. "Prosecutorial Misconduct" Claims

¶40    Reid contends that the State committed prosecutorial misconduct when the prosecutor (1) improperly asked leading questions, (2) solicited hearsay, and (3) made inappropriate statements during closing argument. Although Reid characterizes these issues as "prosecutorial misconduct" claims, our supreme court recently clarified that prosecutorial misconduct is not "a standalone basis for independent judicial review." *State v. Hummel*, 2017 UT 19, ¶ 111, 393 P.3d 314. When a defendant raises a claim of prosecutorial misconduct on appeal, "the question for our review is not whether to question the prosecutor's actions." *Id.* ¶ 117. Instead, "[a]ppellate courts review the decisions of lower courts," not "the actions of [the prosecutor]—at least not directly." *Id.* ¶ 107. Therefore, when a defendant has raised an alleged prosecutorial misconduct issue below, we review the district court's ruling on that objection or motion. *Id.* ¶¶ 106–07. On the other hand, when a defendant fails to raise the issue before the district court, "the law of preservation controls" and we review the issues "under established exceptions to the law of preservation," namely, plain error, exceptional circumstances, or ineffective assistance of counsel, if the appellant argues that one of these exceptions apply. *Id.* ¶ 111.

¶41    Here, Reid has argued under both the plain-error and ineffective-assistance-of-counsel exceptions. Accordingly, "our disposition turns on whether the trial court plainly erred" by not intervening sua sponte or whether defense counsel "rendered ineffective assistance" in failing to object, move for a mistrial, or seek another appropriate remedy. *State v. Bond*, 2015 UT 88, ¶ 30, 361 P.3d 104.

A.    Leading Questions

¶42    Pointing to three specific examples, Reid contends that by asking K.R. leading questions, the prosecutor supplanted K.R.'s testimony with that of the prosecutor. The first set of leading

questions involved the prosecutor's attempt to elicit the amount of time K.R. had spent discussing the assault with the Legal Aid staff members who helped her obtain a protective order. During this line of questioning, the prosecutor asked multiple leading questions: "They asked you to give them a brief description of what happened, correct?" "They didn't spend an hour with you?" "They spent what, minutes?" Defense counsel objected, and the court sustained the objection and reminded the prosecutor to "make sure you don't ask leading questions." The next leading question occurred when the prosecutor asked K.R., "Do you recall if you told [the detectives] each of the events, the main three events of what [Reid] had done to you? . . . The licking, the grabbing—" Lastly, the prosecutor began to lead K.R. when asking, "So just to be perfectly clear, you didn't get to see the whole movie on the—did you or did [you] not see the whole movie on the 27th of May, 2015?" These last two questions did not elicit any objection by defense counsel or intervention by the judge.

¶43 Reid argues that the "prosecutor's persistence in asking leading questions" constitutes misconduct. He contends that his defense counsel was ineffective for failing to move for a mistrial based on this alleged misconduct and that the district court committed plain error by failing to take additional "corrective action."

¶44 While the prosecutor's improper use of leading questions certainly merited an objection, the district court properly sustained each of defense counsel's objections. Moreover, the court took additional corrective action sua sponte by admonishing the prosecutor to avoid leading the witness. But the prosecutor's error in formulating a handful of questions can hardly be said to rise to the level of prosecutorial misconduct, let alone prosecutorial misconduct so egregious that any reasonably competent defense counsel would have moved for a mistrial. Nor were these missteps sufficiently serious to merit further intervention by the district court. If Reid believed that the district court's response was inadequate, "he had a duty to ask

the judge to do more." *State v. Hummel*, 2017 UT 19, ¶ 120, 393 P.3d 314. "Where the judge gave him everything he asked for (sustaining his objection), he is in no position to ask for more on appeal." *Id.*

B.    Hearsay

¶45    Next, Reid contends that the prosecutor improperly solicited hearsay from K.R.'s grandmother. The State responds that the grandmother's hearsay testimony was unexpected, brief, and corrected by the prosecutor to eliminate any prejudice from the improper statement.

¶46    When questioned by the prosecutor about the events on May 28, 2015, K.R.'s grandmother stated, "I just remember [K.R.] coming up [the stairs] and I was out in the hallway upstairs and she came crying and said, Grandma, I got to talk to you. And so she told me what had happened to her." Following up on this testimony, the prosecutor asked, "And what happened to her with *whom*?" (Emphasis added). Instead of answering the direct question by simply naming Reid, she responded, "That [Reid] had raped—" The prosecutor quickly interrupted and corrected the witness, asking, "Not the words, but *with whom*? Something had happened to [K.R.] *with whom*? Something happened between [K.R.] and?" (Emphasis added). To this question, K.R.'s grandmother simply responded with Reid's name.

¶47    Because counsel did not object at trial, Reid must establish that his counsel was ineffective for failing to object or that the district court committed plain error by failing to intervene sua sponte. On this record, Reid cannot establish either deficient performance by counsel or plain error by the court. Defense counsel "may reasonably have believed it ill-advised to call undue attention to the unanticipated testimony . . . [and thus] counsel's actions in ignoring the testimony may be considered sound trial strategy." *State v. Harper*, 2006 UT App 178, ¶ 25, 136 P.3d 1261; *see also State v. Hummel*, 2017 UT 19, ¶ 109, 393 P.3d 314 (noting that "the defense may be aware of a prosecutor's

misstep but choose not to highlight it through an objection"). Similarly, the district court did not plainly err in declining to draw undue attention to the statement, particularly where the prosecutor acted promptly to redirect the witness. Moreover, K.R. had already testified that she told her grandmother that day that Reid had raped her. The fact that K.R.'s statement was already properly before the jury lessened the impact of the hearsay offered by the grandmother and made the decision not to intervene eminently reasonable on the part of both defense counsel and the court.

C.      Closing Argument

¶48     Finally, Reid contends that the prosecutor made several comments amounting to misconduct during closing argument. First, he argues that the prosecutor implied that K.R. had diminished mental capacity when the prosecutor referred to her as a "little girl" and suggested that K.R. was unable to resist Reid. Second, Reid argues that the prosecutor gave improper personal opinion by implying that the use of the lotion as lubricant meant K.R. did not consent. Finally, he argues that the prosecutor acted improperly when he referred to K.R. as a victim, vouched for her credibility, and played on the jurors' sympathies.

¶49     In closing argument, attorneys have "considerable latitude" concerning the issues they raise and "have the right to fully discuss from their perspectives the evidence and all inferences and deductions it supports." *State v. Dibello*, 780 P.2d 1221, 1225 (Utah 1989). "And the law recognizes the prerogative of opposing counsel to swallow their tongue instead of making an objection that might have the risk of highlighting problematic evidence or even just annoying the jury." *State v. Hummel*, 2017 UT 19, ¶ 110, 393 P.3d 314. When we review ineffective-assistance-of-counsel claims in this context, "the question is not whether the prosecutor's comments were proper, but whether they were so improper that counsel's only defensible choice was to interrupt those comments with an objection." *State v. Ringstad*,

2018 UT App 66, ¶ 66 (quotation simplified). In assessing claims of plain error, we ask whether the prosecutor's statements were "so egregiously false or misleading that the judge had an obligation to intervene by raising an objection *sua sponte*." *Hummel*, 2017 UT 19, ¶ 119.

¶50 None of the remarks in this case rises to that level. But even assuming that some of the prosecutor's comments should have prompted an objection or intervention by the court, Reid cannot establish prejudice. Both "ineffective assistance of counsel and plain error share a common standard of prejudice." *Ringstad*, 2018 UT App 66, ¶ 69. "Prejudice exists when, absent the error, there is a reasonable likelihood of a more favorable outcome for the defendant." *Id.* ¶ 64. There is no reasonable likelihood that the jury would have reached a more favorable verdict in this case absent the challenged comments.

¶51 As previously discussed, the State presented compelling evidence of guilt. Reid lied to the police when interviewed, first claiming that he did not remember what happened on the day of the assault, then later claiming that he had no interaction with K.R., and finally admitting to casual interaction but denying any sexual contact. He then gave his wife a false alibi, saying that he could prove he had been at a motel at the time of the alleged assault. Moreover, the story he ultimately told the jury at trial was inconsistent with the physical evidence. He claimed that he never penetrated K.R.'s vagina, either with his finger or his penis, and yet his DNA was found not just on the vulvar swabs but inside the vagina as well.

¶52 In contrast, K.R.'s prior statements—in her initial police report, to the examining nurse, to the Legal Aid staff who had assisted her with the protective order, and during her full interview with the police—were largely consistent with her testimony, varying only in the degree of detail included. The physical evidence also corroborated K.R.'s version of events. In addition to the DNA evidence, K.R. had bruises on her legs where she claimed Reid had grabbed her and held her down and

she had some redness at the opening of her vagina that was inconsistent with the external touching that Reid claimed.

¶53 Moreover, the jury instructions mitigated the risk that the jury would convict based on the prosecutor's arguments rather than on the evidence. The court instructed the jury that it could convict Reid "only on the evidence that [it] saw and heard here in court" and clarified that "[t]he lawyer's statements and arguments are not evidence." "In the absence of any circumstances suggesting otherwise, courts presume that the jury follows . . . instructions." *State v. Wright*, 2013 UT App 142, ¶ 42, 304 P.3d 887. Therefore, even if some of the prosecutor's comments in closing argument merited an objection or other corrective action, there is no reasonable probability that the jury convicted Reid based on those comments rather than on the strength of the evidence.

## CONCLUSION

¶54 We conclude that Reid has failed to establish either ineffective assistance of counsel or plain error that would justify reversing his convictions. Accordingly, we affirm.

—————