**2021 UT App 136**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
OMAR GUERRO,
Appellant.

Opinion
No. 20190534-CA
Filed December 9, 2021

Seventh District Court, Moab Department
The Honorable Don M. Torgerson
No. 181700206

Emily Adams, Freyja Johnson, Cherise M. Bacalski,
and Benjamin Miller, Attorneys for Appellant

Sean D. Reyes and Jeffrey D. Mann, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN D. TENNEY
concurred.

MORTENSEN, Judge:

¶1 Omar Guerro contends that he was falsely accused and wrongly convicted of murder and kidnapping—even though multiple witnesses identified him as perpetrating these crimes. He claims that the trial court erred in admitting certain text messages into evidence and that his counsel rendered ineffective assistance in several ways. We reject Guerro's claims of error and ineffective assistance, and we affirm his convictions.

## BACKGROUND[1]

### *The Murder*

¶2 Guerro had recently moved to Moab, Utah, and had become acquainted with six individuals: Rojo, Jaime, Jorge, BreeAnna, Kevin, and Melina. One day, Guerro and Jaime purchased beer and brought it to Rojo's residence at a trailer park. As the others began to arrive, the group began drinking the beer and smoking methamphetamine. Melina went to a bedroom in the back of the trailer, while the others remained in the front living area near the kitchen.

¶3 After Jorge arrived, the mood became "tense." Guerro accused Kevin and Rojo of stealing drugs, and he then produced a handgun and demanded everyone turn over their cell phones. When Guerro questioned Kevin and Rojo about the drugs and the whereabouts of Guerro's family, Rojo claimed that he did not "know anything."

¶4 Guerro responded by calling Rojo a "dog," demanding, "Tell me the truth, and I'll give you another chance. I'll respect your life," and, "[T]ell me what you know about my family." Rojo continued to say he did not know anything and looked to the others "like [he was] asking for help." Guerro then shot Rojo in the chest, puncturing his lung and breaking a rib. BreeAnna, Rojo's girlfriend, went to Rojo's aid, reiterated that he did not know anything, and pleaded for his life. Guerro responded by hitting Rojo on the head with the gun and then shooting him in the head from about a foot away, killing him instantly. Then

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (cleaned up).

Guerro asked, "Where's Kevin? He's next." Kevin ran toward the back of the trailer, while Jaime stopped Guerro from pursuing him by telling Guerro that he needed to leave.

*The Flight and Arrest*

¶5    Guerro told the group that they "should do what he would tell [them] to do if [they] didn't want to happen to [them] what had happened to Rojo." Jorge, Jaime, and BreeAnna followed Guerro's "orders" to leave the trailer with him and flee the trailer park in Jorge's vehicle.

¶6    Another resident of the trailer park (Neighbor) was outside when he heard the gunshots and commotion. He recognized the voices of BreeAnna, Jorge, and Jaime as they were leaving the trailer, but he did not recognize the voice of a fourth person. Neighbor went into the trailer—after Guerro and company had left—and saw Rojo's body. Neighbor then heard a car pulling up, and he ran out of the trailer and hid in his backyard.

¶7    After only a few minutes, Guerro and the others had returned to retrieve drugs and cell phones they left in the trailer. Guerro ordered Jaime to collect these items from the trailer. Jaime put all the cell phones and drugs in a backpack, except for his own phone, which he placed in his pocket. After Jaime returned from the trailer, the group left again with Jorge driving, Guerro in the front passenger seat, and BreeAnna and Jaime in the back. A short time later, Jaime "made a sign to [Jorge] with [his] eyes . . . telling him to slow down," and he jumped out of the car. The remaining trio attempted to return to the trailer to retrieve personal items and get Kevin and Melina, but as they approached, Guerro saw the police were there and ordered Jorge to stop. Guerro pointed the gun at Jorge and BreeAnna, threatening the pair to stay with him, but BreeAnna managed to escape by running toward a nearby crowd.

¶8 Guerro then called Jaime for a ride, threatening Jaime's family if he failed to help. Jaime's father showed up and took them to Jaime's uncle's house. From there, Guerro, Jaime, and Jorge went on the run for several days through southern Utah and Arizona. Arizona law enforcement eventually found their car and attempted to stop it, but Guerro sped away with Jaime and Jorge. The car ran out of gas and crashed after a brief chase. Jorge and Jaime were apprehended and explained that Guerro had kidnapped them. Guerro was apprehended about a quarter-mile from the car. He had a spent shell casing in his pants pocket at the time of his arrest. Police also found a gun, which Guerro had tossed out of the car before the crash, and a bag containing drugs and money.

¶9 The firearm that the police found, a .40 caliber handgun, had a round chambered and several other unspent rounds in the magazine. The brass and aluminum casings of those rounds matched the ammunition—two bullets and two casings—that was collected at the scene of Rojo's murder. The casing found in Guerro's pocket was also .40 caliber. Guerro's fingerprint was recovered from the gun's magazine.

¶10 Guerro was charged with murder, three counts of aggravated kidnapping, and one count of possession of a firearm by a restricted person.

*The Trial*

¶11 At trial, BreeAnna, Jorge, and Jaime, among others, testified for the State, recounting the events as described above. *See supra* ¶¶ 2–8. Kevin's preliminary hearing testimony was admitted by stipulation at the trial because he was unavailable to testify due to being incarcerated out of state. We highlight other testimony and evidence relevant to the issues on appeal as follows.

1.     Text Messages

¶12   The State called Neighbor to testify. During cross-examination, Guerro's attorney (Counsel) asked Neighbor about texts that he had received from his sister. These text messages had been sent by Kevin to the sister shortly after the murder. The sister, in turn, sent screenshots of those text messages to Neighbor. Counsel asked Neighbor, "[A]t that time immediately after the offense in question, Kevin identified Jaime as the shooter?" Neighbor answered, "Yeah. . . . I wasn't sure if he was the shooter, but yes . . . ." On redirect, the prosecutor asked Neighbor about the text messages, and Neighbor said that he "didn't read over them, [but he] just got them and . . . sent them to the detective." Neighbor again said that "Kevin was actually saying that [Jaime] was the shooter."

¶13   The prosecutor then sought to admit screenshots of the text messages that the sister received from Kevin and that she subsequently sent to Neighbor. The text messages were written in Spanish and translated by a court certified interpreter. Counsel promptly objected on the grounds that the text messages could not be authenticated and that Kevin was unavailable to testify about the messages. The prosecutor responded that the State had not intended to introduce the text messages, but it did so because the "defense is the one that brought this issue of these texts up." Because Counsel "raised an issue" that "Kevin identified Jaime as the shooter" in the text messages, the prosecutor argued that "[t]his is the response that we have, [screenshots] that were made that night in question." He added, "I don't think [Counsel] can bring it up and then say they're not authentic. We have to be able to respond to that."

¶14   The court ruled "that as far as authentication goes, the evidence is that [Neighbor had] identified that those are in fact the messages that he received." The court later clarified that the text messages were admissible under rule 806 of the Utah Rules of Evidence. *See* Utah R. Evid. 806 ("When a hearsay statement

. . . has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness.").

¶15   The prosecutor then reviewed with Neighbor the text messages in question. The prosecutor asked Neighbor about the following exchange between his sister and Kevin:

> Sister: "Who killed him, Kevin? Who was it? Was it BreeAnna?"
>
> Kevin: "It was a guy that was with Jaime."

The prosecutor then asked Neighbor, "Is that correct?" And Neighbor testified, "Yes." Another text message exchanged between Kevin and the sister similarly indicated that the individual who killed Rojo was "[t]he one that was with [Jaime]" and that Kevin did not "know his [i.e., the shooter's] name." Nowhere in the text messages reviewed with Neighbor was there any indication that Kevin stated Jaime was the shooter.

2.   The DNA Testing

¶16   The State also called a fingerprint examiner (Examiner) who had inspected the fingerprints on the gun. She testified that Guerro's fingerprint was found on the gun's magazine and that it was the only usable print on the gun; in other words, it was the only one that "contained enough detail" to make an identification.

¶17   On cross-examination, Counsel asked Examiner about DNA swabs she had taken from the gun, bullet casings, and a cell phone. She explained that part of her job was to collect possible sources of DNA from items, but the samples were sent to a different laboratory for analysis. Examiner further noted that while she was aware that a DNA report was completed, she did

not "have any actual training on the analysis of the reports" or on making "conclusions or giv[ing] much detail regarding the nature of [DNA] reports." When Counsel began to ask about the DNA report, the State objected, asserting that the DNA report should not be admitted because there was nobody present to testify about it. Nevertheless, Counsel stated that he intended to "make [Examiner] familiar with [the DNA report] and see if she can answer some questions based on what [he] show[ed] her, since [the State did not] have anybody [there] for the DNA report." Counsel then asserted that Examiner could read the report aloud without opining on it. The court responded that having her simply read it aloud "doesn't meet the standard of being anything that will assist the jury in making a decision" because "she can't give any information that they wouldn't be able to gather themselves." Counsel then stated that he would "just put it in evidence." The State promptly objected, saying that there was "nobody to verify" or "authenticate" the report. The court sustained the objection, and neither the report nor testimony about its contents was introduced. The DNA report is not in the record.

### 3.    Guerro's Testimony

¶18    In contrast to the testimony of Jaime, BreeAnna, Kevin, and Jorge regarding the events surrounding Rojo's murder, Guerro had a different take, denying the charges of murder and kidnapping and portraying Jaime as the culprit. He asserted that Jaime and Rojo were arguing about money and dealing drugs, that it was Jaime who shot Rojo (with a gun Jaime owned), and that it was Jaime who searched for Kevin.

¶19    Guerro asserted that he did not force anyone into the vehicle to flee after Rojo's murder. He testified that Jaime was the one who orchestrated the flight. He also explained that he could have picked up the bullet casing from inside the car after Jaime had fired the gun while they were driving.

¶20  Guerro accounted for his fingerprints on the gun by explaining that he had handled the gun previously: "I myself cleaned that gun. I assembled it and I even oiled the springs. I kind of removed everything, I put it back together completely." Guerro also asserted that Jaime gave the gun to him to hold a few times during the flight through southern Utah and Arizona.

¶21  Guerro claimed that he learned he was a suspect in Rojo's murder and confronted Jaime about it when they got to Arizona. Guerro testified that Jorge threw a bag out of the car and that Jaime tossed the gun. Guerro said he ran when the car crashed because he knew he was a suspect.

¶22  On cross-examination, the prosecutor asked Guerro about the truthfulness of the testimony offered by the group that was present the evening of the murder:

> Prosecutor: "You've heard testimony that all of the witnesses said you were concerned and asking questions about what happened to your family."
>
> Guerro: "I did hear that."
>
> Prosecutor: "You heard that from BreeAnna?"
>
> Guerro: "Almost all of them said that."
>
> Prosecutor: "Okay. You want this jury to believe that they all lied about that?"
>
> Guerro: "Why wouldn't they? They're part of the same circle."

*The Verdict and Appeal*

¶23  The jury convicted Guerro of murder, aggravated kidnapping of Jorge, and possession of a firearm by a restricted

person. It found him not guilty of the aggravated kidnapping of BreeAnna and Jaime. Guerro appeals.

ISSUES AND STANDARDS OF REVIEW

¶24   Guerro claims that the trial court abused its discretion when it allowed the State to admit the text messages into evidence without proper authentication. "We review the legal questions to make the determination of admissibility [of evidence] for correctness. We review the questions of fact for clear error. Finally, we review the trial court's ruling on admissibility for abuse of discretion." *Arnold v. Grigsby*, 2018 UT 14, ¶ 9, 417 P.3d 606 (cleaned up).

¶25   Guerro also raises various ineffective-assistance-of-counsel claims, which we will consider in three parts. First, he asserts that Counsel was ineffective for not objecting to screenshots of the text messages on the ground that they lacked an accurate translation. Second, Guerro claims that Counsel was ineffective when he did not object to the prosecutor asking Guerro, "You want this jury to believe that they all lied about that?" Third, Guerro argues that Counsel was ineffective when he did not call a witness who could testify about the multiple DNA profiles on the gun. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Reid*, 2018 UT App 146, ¶ 17, 427 P.3d 1261 (cleaned up).

ANALYSIS

I. Authentication of Text Messages

¶26   Neighbor testified that his sister sent him text messages—which she received from Kevin—in which Kevin identified Jaime

as the individual who shot and killed Rojo. At the end of his cross-examination of Neighbor, Counsel specifically asked Neighbor about the text messages he had received from his sister:

> Counsel: "While you were being interviewed [by the police], you were receiving text messages from your sister, . . . right?"
>
> Neighbor: "Yeah."
>
> Counsel: "And she in turn was in contact with Kevin at that time, correct?"
>
> Neighbor: "Yes."
>
> Counsel: "And at that time immediately after the offense in question, Kevin identified Jaime as the shooter?"
>
> Neighbor: "Yeah. Well, he didn't—I wasn't sure if he was the shooter, but yes, we—my—the messages my sender—my sister sent to one of the detectives, and they read over it."
>
> Counsel: "Well, you didn't—you didn't see what happened inside the trailer?"
>
> Neighbor: "No, I did not see what happened in there."
>
> Counsel: "But Kevin did?"
>
> Neighbor: "Kevin—I believe so."

¶27 On redirect, the prosecutor continued questioning Neighbor about the text messages by showing him the screenshots he had received from his sister, at which point

Counsel—who had brought up the text messages in the first place—objected to their admission for lack of authentication. The trial court ruled that the text messages had been authenticated by Neighbor because he had identified them as those he had received. In addition, the court determined the messages were admissible under rule 806 of the Utah Rules of Evidence.

¶28 Guerro now complains that the trial court erred in allowing the screenshots of the text messages to be admitted. While the trial court ruled that the text messages were admissible because Neighbor had authenticated them and under rule 806, we determine that the principle of curative admissibility applies to the admission of the text messages and note that we may affirm a decision reached by the trial court "on any legal ground or theory apparent on the record." *See State v. McLeod*, 2018 UT App 51, ¶ 21, 420 P.3d 122 (cleaned up); *accord Berrett v. State*, 2018 UT App 55, ¶ 18, 420 P.3d 140.

¶29 The principle of "curative admissibility" provides that a party who "interjects into a case" inadmissible evidence "cannot complain on appeal that his adversary subsequently offered and was permitted to introduce the same kind of evidence." *Barson ex rel. Barson v. E.R. Squibb & Sons, Inc.*, 682 P.2d 832, 840 (Utah 1984) (cleaned up); *see also State v. Dalton*, 2014 UT App 68, ¶ 29, 331 P.3d 1110 ("While certain evidence may be excludable when elicited or offered by the prosecution to prove its case-in-chief, the same evidence may not be excludable when the responsibility for its introduction may be traced to the defendant." (cleaned up)); *State v. Mahi*, 2005 UT App 494, ¶ 17, 125 P.3d 103 ("A party cannot introduce potentially inflammatory evidence and then later complain when the opposing party attempts to rebut it."); *State v. Ramos*, 882 P.2d 149, 154 (Utah Ct. App. 1994) (holding that when a defendant "elicited testimony regarding [a mug shot's] existence when cross-examining [a detective]," he could not "on appeal attack the admission of the photograph because he himself opened the door to its introduction on cross-examination").

¶30    Morevoer, "once the defendant offers evidence or makes an assertion as to any fact, the State may cross-examine or introduce on rebuttal any testimony or evidence which would tend to contradict, explain or cast doubt upon the credibility of [the defendant's] testimony." *State v. Thompson*, 2014 UT App 14, ¶ 30, 318 P.3d 1221 (cleaned up). Thus, a defendant is not allowed "to introduce a document to establish a fact critical to the case without allowing the prosecution to challenge the underlying premise that the document is accurate." *Id.* ¶ 31; *see also United States v. Fleming*, 19 F.3d 1325, 1331 (10th Cir. 1994) ("A defendant may not make false statements on direct examination and rely on the government's inability to challenge his credibility as to the truth of those statements.").

¶31    Here Guerro not only raised the issue of the text messages, but he also mischaracterized that evidence in the process. So the State was entitled to use the very evidence Guerro introduced in its rebuttal and to clarify precisely what Kevin had communicated to Neighbor's sister. Neighbor's testimony about the content of the text messages—elicited first by Counsel—left the jury with the false impression that Kevin's texts explicitly "identified Jaime as the shooter." Having introduced this "potentially inflammatory evidence," Guerro cannot now complain about the State's "attempts to rebut it." *See Mahi*, 2005 UT App 494, ¶ 17; *cf. State v. Reed*, 820 P.2d 479, 482 (Utah Ct. App. 1991) ("It would be a mockery of our justice system to allow a defendant to take the stand and testify as to his own good character while impugning the character of an opposing witness, and then claim that his testimony is not subject to cross-examination because such inquiry would be too prejudicial."). In his cross-examination of Neighbor, Counsel essentially elicited a misleading—if not outright false—testimonial statement regarding the content of the text messages, thus "open[ing] the door" to allow the prosecution to present that same evidence to dispel the false impression. *See Mahi*, 2005 UT App 494, ¶ 17 (cleaned up).

¶32    Thus we conclude that the trial court did not abuse its discretion in admitting evidence of the text messages after Guerro introduced that evidence during his cross-examination of Neighbor.

## II. Ineffective Assistance Claims

¶33    "To prevail on a claim of ineffective assistance of counsel, the defendant must show that (1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense." *State v. Wright*, 2021 UT App 7, ¶ 52, 481 P.3d 479 (cleaned up). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [Guerro's] claims under either prong." *See Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182.

¶34    To show that Counsel performed deficiently, Guerro must overcome the presumption that Counsel's challenged actions and decisions fell "within the wide range of reasonable professional assistance." *See Strickland v. Washington*, 466 U.S. 668, 689 (1984). "The court gives trial counsel wide latitude in making tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (cleaned up). And "even where a court cannot conceive of a sound strategic reason for counsel's challenged conduct, it does not automatically follow that counsel was deficient. . . . The ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350 (cleaned up); *see also State v. Ray*, 2020 UT 12, ¶ 36, 469 P.3d 871 ("A reviewing court must always base its deficiency determination on the ultimate question of whether counsel's act or omission fell below an objective standard of reasonableness.").

¶35   "Counsel's performance is prejudicial if the defendant can demonstrate that there is a reasonable probability that the outcome of his or her case would have been different absent counsel's error. Accordingly, the defendant must do more than simply show that the errors had some conceivable effect on the outcome of the proceeding." *Wright*, 2021 UT App 7, ¶ 54 (cleaned up).

A.   Translation of Text Messages

¶36   Guerro contends that Counsel should have objected to the translation of the text messages.[2] Specifically, he argues that "the

--------

2. Guerro also argues that Counsel was ineffective for not objecting to the admission of the text messages on hearsay grounds. But the State did not offer the text messages into evidence "to prove the truth of the matter asserted in the statement"—that Jaime was the shooter and Guerro was not or that Guerro was the shooter and Jaime was not—but merely to show that no text message identified Jaime as the shooter and that Neighbor was mistaken in testifying that the text messages said Jaime was the shooter. *See* Utah R. Evid. 801(c)(2); *see also State v. Hutchison*, 655 P.2d 635, 636 (Utah 1982) ("When an out-of-court statement is offered only to prove that the statement was made, without regard to its truth or falsity, it is not proscribed by the hearsay rule."). Because the text messages were therefore not hearsay, any objection on hearsay grounds would have been futile and cannot be a basis for ineffective assistance. *See State v. Makaya*, 2020 UT App 152, ¶ 9, 476 P.3d 1025 (explaining that "the failure of counsel to make motions or objections which would be futile if raised does not constitute ineffective assistance" (cleaned up)). Moreover, the same curative-admissability reasoning we applied to the authentication issue, *see supra* ¶¶ 29–31, leads to the same place, and we decline to consider Guerro's hearsay ineffectiveness claim any further.

translation should have never been admitted" "without the witness who conducted the translation testifying."

¶37    But Guerro fails to prove either deficient performance or prejudice because he has made no effort to offer evidence—or even an argument—that the translation was in any way inaccurate. "It should go without saying that the absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Burt v. Titlow*, 571 U.S. 12, 23 (2013) (cleaned up). Without some showing that the translation was incorrect—perhaps by seeking remand under rule 23B of the Utah Rules of Appellate Procedure—there is simply no way for us to determine if Counsel performed deficiently or if this putative deficiency prejudiced Guerro. In the absence of any evidence that the translation contained errors, we must stand by the "strong presumption" that Counsel rendered "reasonable professional assistance." *See id.* (cleaned up). After all, if there were no errors in the translation—and there is no evidence to suggest there were—a reasonable attorney would have no reason to object to the translation and would also know that the objection would be futile. *See State v. Torres*, 2018 UT App 113, ¶ 16, 427 P.3d 550 ("Because the decision not to pursue a futile motion is almost always a sound trial strategy, counsel's failure to make a motion that would be futile if raised does not constitute deficient performance." (cleaned up)). Accordingly, we conclude that Counsel did not render ineffective assistance in not objecting to the translation's authenticity.

B.    Prosecutor's Question

¶38    Guerro's next contention is that Counsel rendered ineffective assistance when he did not object to the prosecutor's question of Guerro asking him to comment on the veracity of the State's witnesses. Guerro argues that the prosecutor's question was improper because it called on Guerro to comment on the motivations and character of the other witnesses. Guerro asserts

that it was "objectively unreasonable" for Counsel not to object because asking the question "harmed" Guerro's "credibility, and credibility was crucial to [Guerro's] case."

¶39 Here, it is clear that Counsel's decision not to object to the prosecutor's question was not objectively unreasonable but constituted a sound tactical decision. Counsel had a compelling tactical reason not to object: one of the main themes of Guerro's defense was that the State's witnesses were indeed lying.

¶40 The prosecutor specifically asked Guerro whether he wanted the jury to believe that all the State's witnesses were lying about whether they had heard Guerro express concern for his family. Guerro responded, "Why wouldn't they [lie]? They're part of the same circle." Counsel reiterated this same theory in his closing: "The idea that Rojo, low man on the totem pole in the drug world in Moab, Utah, whipping boy of Jaime and BreeAnna, could somehow be involved in the disappearance of [Guerro's] . . . wife and children. That idea is once again, in a word, absurd." Counsel would thus have no reason to object to a question that supported the specific defense narrative he was trying to build.

¶41 Moreover, Counsel had already attacked the overall credibility of the witnesses to the events on the night of the murder in his opening:

> What the evidence will show with respect to these witnesses [is] that they are all completely and totally unreliable. All of the witnesses, the lay witnesses, BreeAnna, Jorge, Jaime and Kevin are all serious drug users and/or dealers . . . . Everyone is going to say that [Guerro] shot Rojo. All of them, but listen for the inconsistencies in their testimony, and take into account their actual conduct, which in the context of this going on, . . . somebody is laying on the floor dead, and they're all trying to

get out of there, ask if their conduct makes any sense whatsoever in that context, claiming that they've been kidnapped, for example.

¶42 And in his closing, Counsel continued to develop the theory that the witnesses were lying. He told the jurors that the trial was "a contest of what version of the events makes the most sense in real life," that "it's going to be hard for you to believe anything that they say," that "[t]hey had plenty of time to coordinate their stories," and that "they [had] the motivation to lie" and "point a finger" at Guerro, an "unknown guy" and outsider to the group.

¶43 Thus, Guerro's response—"Why wouldn't they [lie]?"— was entirely consistent with the defense's theme that the State's witnesses had machinated to pin the blame on Guerro. Rather than being an occasion to object, it is more likely that Counsel welcomed the prosecutor's question as beneficial to the defense strategy he had developed throughout the trial.

¶44 In sum, because he has failed to show that Counsel's performance was deficient in not objecting to the prosecutor's question, Guerro's ineffective assistance claim fails.

C. DNA Testing

¶45 Guerro contends that Counsel was ineffective when he did not call a witness to testify about the DNA report. But the DNA report is not in the record, and the absence of evidence that Counsel performed deficienty—here the DNA report and expert testimony explaining it—prevents Guerro from successfully proving Counsel was ineffective. Thus, this claim fails because Guerro has failed to carry his burden of proof to show Counsel performed deficiently.

¶46 "A claim of ineffective assistance of counsel may be raised on appeal if the trial record is adequate to permit decision of the

issue. Consequently, a defendant cannot bring an ineffective assistance of counsel claim on appeal without pointing to specific instances in the record demonstrating both counsel's deficient performance and the prejudice it caused the defendant." *State v. Griffin*, 2015 UT 18, ¶ 16, 441 P.3d 1166 (cleaned up); *cf. Burt v. Titlow*, 571 U.S. 12, 23 (2013) ("It should go without saying that the absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." (cleaned up)). And on appeal, when a "defendant raises a claim that trial counsel was ineffective," the "defendant bears the burden of assuring the record is adequate." *State v. Litherland*, 2000 UT 76, ¶ 16, 12 P.3d 92.

¶47　"Where trial counsel's alleged ineffectiveness caused or exacerbated record deficiencies, defendants . . . have an appropriate procedural tool for remedying those deficiencies." *Id.* And that procedural tool is a motion for remand to supplement the record. *See* Utah R. App. P. 23B(a) ("A party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel. The motion will be available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective."). A rule 23B "motion must be filed before or at the time of the filing of the appellant's brief," *id.*, and the appellant "bears the primary obligation and burden of moving for a temporary remand," *Litherland*, 2000 UT 76, ¶ 16.[3]

_____

3. Invoking rule 11(h) of the Utah Rules of Appellate Procedure, Guerro seeks to supplement the record with the DNA report. *See* Utah R. App. P. 11(h) ("If anything material to either party is . . . omitted from the record by error [or] by accident, . . . the appellate court . . . may direct that the omission or misstatement

(continued…)

¶48    Because the DNA report is not a part of the record, and because Guerro has not sought remand to the trial court under rule 23B to provide for its consideration, we determine that he has not carried his burden of proof to show that Counsel rendered ineffective assistance with respect to not calling a witness to testify about the report. *See State v. Law*, 2003 UT App 228, ¶ 2, 75 P.3d 923 ("Because the [d]efendant attempts to introduce evidence on appeal not contained within the record, we cannot consider this issue on appeal.").

---

(…continued)

be corrected and, if necessary, that a supplemental record be certified and transmitted."). But adding new material to the record is not a rule 11(h) situation:

> A motion under Rule 11(h) is appropriate only when the record must be augmented because of an omission or exclusion, or a dispute as to the accuracy of reporting and not to introduce new material into the record. The rule provides a reliable method for the reconstruction of events when the record has failed in some limited respect.

*Olson v. Park-Craig-Olson, Inc.*, 815 P.2d 1356, 1359 (Utah Ct. App. 1991) (cleaned up). There was no mistake or omission regarding the admission of the DNA report at the trial court. Rather, the trial court did not allow the report to be admitted because it could not be authenticated. Put simply, it was never part of the record below, and so could not be "omi[tted] or misstate[d]" in the record on appeal. *See* Utah R. App. P. 11(h). As we point out above, the appropriate procedural mechanism to add new materials to the record in an effort to prove ineffective assistance of counsel is a rule 23B motion. Guerro could have availed himself of that procedure to request the DNA report become part of the record on appeal, but he did not. Accordingly, we deny Guerro's rule 11(h) motion.

CONCLUSION

¶49 Guerro's challenge to the admission of the text messages on authenticity grounds fails because he was the one who introduced that evidence during his cross-examination of Neighbor, and he cannot now complain about their inclusion. His claim that Counsel was deficient in not challenging the translation of the text messages does not succeed because he has offered no evidence to show there were errors in the translation, so he cannot demonstrate either deficient performance or prejudice. Guerro's assertion that Counsel rendered ineffective assistance in not objecting to the prosecutor's question fails because the prosecutor's question meshed with Guerro's defense, so there was an objective reason for Counsel to refrain from objecting. And we conclude that the record Guerro presents on appeal does not show Counsel rendered ineffective assistance with regard to the DNA report.

¶50 Affirmed.[4]

––––––––––

4. Guerro also asserts a claim of cumulative error. But "because we conclude that there are no errors to accumulate here, the cumulative error doctrine is inapplicable in this case." *State v. Modes*, 2020 UT App 136, ¶ 12 n.5, 475 P.3d 153 (cleaned up).