2024 UT App 20

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ARLEN J. PRETTYMAN,
Appellant.

Opinion
No. 20210868-CA
Filed February 15, 2024

Seventh District Court, Price Department
The Honorable Jeremiah Humes
No. 201700454

Emily Adams, Cherise Bacalski, Freyja Johnson, and
Hannah Leavitt-Howell, Attorneys for Appellant

Sean D. Reyes and Connor Nelson,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

LUTHY, Judge:

¶1      Arlen J. Prettyman was arrested after driving erratically and failing subsequent field sobriety tests. A search of his vehicle revealed approximately fifty grams each of heroin and methamphetamine, along with drug paraphernalia and cash. Prettyman was later convicted on two counts of possession of a controlled substance with intent to distribute. He now appeals those convictions, asserting that his trial counsel provided ineffective assistance by not objecting on various grounds to expert testimony regarding the amounts of these drugs that are typically possessed for personal use and comparing those

amounts to the quantities possessed by Prettyman. As to each of his arguments, Prettyman has not shown that his counsel performed deficiently, that he was prejudiced thereby, or both. Accordingly, we affirm.

BACKGROUND

¶2    In July 2020, police received a report of a white truck "swerving all over the road, almost hitting the curb." A Utah Highway Patrol trooper (Trooper) responded and observed a truck driving erratically. Trooper pulled the truck over and found the driver to be Prettyman.

¶3    Trooper instructed Prettyman to get out of the truck to do some tests, explaining that the tests were to see if Prettyman was "good to drive." When Prettyman got out of the truck, he was wearing only underwear, dirty socks with no shoes, and a winter jacket. "His speech was slow and slurred," "he had very dilated pupils," a "cigarette [was] falling out of his mouth," "[h]e wasn't fully alert," he "was struggling to understand or struggling to respond to . . . questions," and he had very poor balance. Trooper administered several field sobriety tests, during which Prettyman exhibited additional signs of impairment. Afterward, Trooper explained to Prettyman that he believed Prettyman was "under the influence of something," specifically "some kind of drug," and on that basis he arrested Prettyman.

¶4    Following the arrest, another trooper and a police officer (Officer) performed a search of Prettyman's truck. During the search, they found multiple baggies of methamphetamine; a "large chunk of heroin"; a fanny pack containing cash and several smaller baggies, including some with heroin residue; and a false can of iced tea for hiding contraband. The drugs were weighed, and they totaled 44.702 grams of methamphetamine and 52.128 grams of heroin. The cash totaled $239.

¶5    Trooper then took Prettyman to the hospital for a blood draw. The blood draw revealed methamphetamine as well as morphine, a metabolite of heroin.

¶6    The State charged Prettyman with two counts of possession of a controlled substance with intent to distribute, one count of driving under the influence of alcohol or drugs, one count of possession of drug paraphernalia, and one count of unsafe lane travel.

¶7    At trial, Trooper and Officer testified to the foregoing facts. Each also provided testimony comparing the quantity of drugs found in Prettyman's truck to quantities that, based on their training and experience, are typically associated with personal use. The State asked Trooper, "[S]o in your training and experience[,] . . . with the fanny pack, the cash inside with all the little separate baggies and the presence of these big chunks of this dark substance and then all this crystal-like substance, all that combined together, in your training and experience what does that lead you to believe?" Trooper responded, "That it was distribution. It was way more than a normal everyday user would use." The State then asked, "And how much would a normal everyday user use typically?" Trooper responded, "[M]y experience is a gram is about what a normal user would have on them at any one time."

¶8    During cross-examination, Prettyman's defense counsel (Counsel) asked Trooper, "[H]ave you had . . . other occasions to pull over people who have drugs in their car?" Trooper responded, "Yes." Counsel asked, "And have you ever pulled over people that were later found to have been engaged in the distribution of drugs?" Trooper responded, "Yes." Trooper also affirmed that about one gram a day is "generally what [he's] seen" with people who use narcotics. Then he had the following exchange with Counsel:

Q. And so heavy drug use would be more; right?

A. There's a possibility, a little bit more.

Q. And even at the rate of one gram a day, if this were Mr. Prettyman's own drugs, . . . he would have had less than a two month's supply; correct?

A. . . . . [N]o, it would be more than a two month's supply from what I experience . . . .

Q. You said about one gram a day. Was it either the meth or the heroin was a little over 50 and the other was a little under 50; correct?

A. I guess if he did both drugs in one day then, yes . . . .

Q. Okay. And so if it was heavy use, it would be a shorter period of time; correct?

A. Possibly, yes.

Q. So it's conceivable that someone who is a heavy drug addict could—if they are able [to—] . . . get their hands on as much drugs as possible to . . . keep their addiction fed for as long as possible; correct?

A. In my training and experience, no, they would not have that amount of drugs on them.

Q. But they certainly could, couldn't they?

A. Obviously they could, but it's . . . not typical.

Upon redirect, Trooper again asserted that, in his experience, it was not normal for people to carry approximately fifty grams of each of these drugs in their vehicles for personal use.

¶9   Counsel did not object to any of these statements from Trooper, but he did inquire into Trooper's qualifications related to narcotics. In response to Counsel's questions, Trooper testified that he had been with the highway patrol for about a year at the time of Prettyman's arrest, that he had gone through Peace Officer Standards and Training (POST) for approximately sixteen weeks at the beginning of that time, and that at POST he had "received some training on drug trafficking and identification of drugs." Counsel characterized this as just "one of the multitude of trainings that [Trooper had] received during POST" and then asked Trooper if that was "the limit of [his] experience in those matters." Trooper responded, "No, that's not," and he stated that he had also completed a "ride along with a more experienced officer for 12 weeks," with this having "a strong focus on standardized field sobriety tests, as well as identification of different drugs, narcotics and contraband." Counsel stated, "So you receive[d] drug training as one of a multitude of trainings at POST and then you [went] on a 12-week-ride-along [where] you cover[ed] pretty much everything that a highway patrolman needs to cover in order to do his job?" Trooper responded, "Yes." Counsel continued, "Okay. And that's the limit of your training in such matters; correct?" And Trooper again said, "Yes."

¶10   Officer's testimony was similar to Trooper's with regard to the implications of the quantities of drugs Prettyman possessed. He said that what "stood out" to him about the heroin was that "it was an amount that's not commonly seen with a personal amount of illicit substances when [he had] arrested people for personal use." The State then questioned Officer on his tenure and experiences as a police officer. Officer testified that he had been an officer—at the time of trial—for three years and seven months, that he had arrested people who possessed heroin and people who possessed methamphetamine, and that he had arrested some users more than once. The State then asked, "Do you have some experience knowing whether a person is . . . simply an addict,

somebody who uses, who buys and uses drugs, and are you able to distinguish that person sometimes from a seller or distributor of those drugs?" Officer responded, "Yes."

¶11 Counsel then objected as to foundation, and the State said, "[L]et me back up. . . . How many people have you arrested in your lifetime for . . . drugs?" Officer responded, "Several. . . . [B]eing in Carbon County, there is a known opioid abuse problem. And with that being said, a lot of people I have taken to jail usually have illicit substances on them, whether it's marijuana, heroin, [or] methamphetamine." The State asked, "Have you arrested people . . . on more than one occasion who have what you'd call a personal use amount or a small use amount?" Officer responded, "Yes, I have." The State asked, "And what is the typical small use amount that you see?" Officer replied, "Commonly seen upon interviewing people [who] have admitted to personal use, commonly seen with people who struggle with a drug addiction usually is a half gram to a gram" of methamphetamine or heroin. He repeated, "Typically that's what we commonly see people possess."

¶12 The State asked, "When you see more than that amount, . . . does that alert any red flags to you?" Officer said that it did, explaining, "Based on what I had observed that day with Mr. Prettyman, with the large amount of suspected heroin and methamphetamine, along with other paraphernalia items such as baggies, those are commonly seen with people who distribute illicit substances." Officer confirmed that he had arrested "people who've had significant amounts of" drugs and people who he had "suspected of being drug dealers or who have had drugs that they intended to sell." The State asked, "How does the amount you saw in Mr. Prettyman's possession compare with other persons you've arrested who have had more than say a gram?" Officer replied, "[In] my personal experience, I had arrested somebody with suspected methamphetamine that weighed out to be 2.2 ounces, which is a considerable amount. If you had to put that

into terms, if you break that into grams, that's a lot of times a personal user would have to have that last."

¶13 The State asked, "Is it common if somebody is a known user . . . to carry around with them personally a month's worth or two month's worth of heroin or meth in their possession if they're simply users?" Officer responded, "No." The State followed up, "Why do you say that?" Officer replied, "Because a lot of times from my experience of talking with people who struggle with a drug addiction, they usually can't afford large amounts of illegal substances such as methamphetamine, heroin, [or] marijuana. So typically they buy . . . enough to last them, you know, a week or a couple of days depending on . . . how much they do use."

¶14 On cross-examination, Officer agreed with Counsel's statement that if a user was "able to pay, it wouldn't be unreasonable for them to get more rather than the bare minimum," but he said, "[I]n my experience I have never seen someone have what we call simple possession of a known drug user to carry 48 grams of methamphetamine or 50-plus grams of heroin for personal use." Counsel then said, "Now when you talk about personal use or distribution, you're talking about things where you haven't actually seen whether drugs were used for personal use or for distribution. I mean, you've kind of reached the conclusion yourself as to how they were used." He continued, "[I]n any case where distribution is alleged, often that's denied. And in those cases, you don't have personal knowledge of how the drugs were actually used, do you?" Officer replied, "It depends. A lot of known drug users have admitted to me what their personal amount is. And I will say there [are] times [it's] more than just a half a gram or a gram. I remember recently arresting somebody that did have approximately . . . 12 grams of methamphetamine that claimed it was their personal use." He continued, "But still, if we take into consideration the situation that we're here for today, even if you look at someone having 13 grams of methamphetamine compared to somebody having 40,

almost 50 grams of methamphetamine, that would still lead me to believe that that can't be used for personal use."

¶15   The jury convicted Prettyman of all charges. He now appeals both of his convictions for possession of a controlled substance with intent to distribute.

ISSUE AND STANDARD OF REVIEW

¶16   Prettyman asserts that Counsel provided ineffective assistance by not objecting to testimony given by Trooper and Officer related to the quantities of drugs that people typically possess for personal use versus for distribution. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Guerro*, 2021 UT App 136, ¶ 25, 502 P.3d 338 (cleaned up), *cert. denied*, 525 P.3d 1254 (Utah 2022).

ANALYSIS

¶17   To succeed on a claim of ineffective assistance of counsel, an appellant must satisfy both prongs of the test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient," meaning that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. In assessing whether this element is met, we afford "a strong presumption that counsel's actions were within the broad range of conduct considered a sound trial strategy." *State v. Hutchings*, 2012 UT 50, ¶ 18, 285 P.3d 1183 (cleaned up). "Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. This requires a showing of "a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different," thereby "undermin[ing] confidence in the outcome." *Id.* at 694. "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [a defendant's] claims under either prong." *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182.

¶18 Prettyman asserts that Counsel was ineffective for not objecting to Trooper's and Officer's testimony because (1) neither witness was qualified to provide expert testimony on narcotics quantities typically possessed for personal use versus quantities typically possessed for distribution; (2) each witness's testimony on this subject was improperly anecdotal, unfounded, and unreliable; (3) the testimony was more prejudicial than probative; and (4) Trooper's testimony included an impermissible legal conclusion. We address each argument in turn.

## I. Counsel's Failure to Object Based on Trooper's and Officer's Qualifications as Expert Witnesses

¶19 Prettyman asserts that he was deprived of the effective assistance of counsel when Counsel did not object to Trooper and Officer offering opinions regarding drug quantities typically possessed for personal use versus quantities typically possessed for distribution because Trooper and Officer failed to establish that they had sufficient "knowledge, skill, experience, training, or education" to testify as experts on that topic. (Quoting Utah R. Evid. 702(a).) We disagree.

### A. Deficient Performance

¶20 Competent counsel could have reasonably decided not to object on the basis that Trooper and Officer lacked sufficient knowledge, skill, experience, training, or education. Under rule 702 of the Utah Rules of Evidence, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education

may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). Because "[t]he quantity of [a narcotic] involved and the nature of its packaging may support the inference that it was possessed for sale rather than personal use," *State v. Bankhead*, 514 P.2d 800, 803 (Utah 1973), information about the quantity of a drug that is typically possessed for personal use may be helpful to the trier of fact. Thus, Utah case law is clear that "[e]xperienced officers may give their opinions" related to narcotics "quantity, packaging, and normal use of an individual." *Id.*

¶21   This reference to "[e]xperienced officers," *id.*, does not exclude the possibility that officers may qualify as experts on narcotics quantities that are typical of personal use versus quantities that are typical of distribution based on any of the other grounds listed in rule 702(a), including "knowledge, . . . training, or education," Utah R. Evid. 702(a). *See State v. Kelley*, 2000 UT 41, ¶ 15, 1 P.3d 546 ("We have routinely allowed persons to testify as experts based on the totality of their qualifications and experience, and not on licensing or formal standards alone."). An officer can therefore qualify as an expert to testify on this subject based on the officer's training or experience or some combination of the qualifications listed in rule 702(a).[1]

¶22   Trooper testified that he had been with the highway patrol for about a year at the time of Prettyman's arrest. He explained that the first four months of that time he had attended POST,

---

1. Additionally, Prettyman has not argued, and we do not believe, that an officer would necessarily need to be trained or experienced in more nuanced facets of narcotics use or distribution to have sufficient experience, knowledge, or training to qualify as an expert on quantities of narcotics typically possessed for personal use versus quantities typically possessed for distribution.

which included specific training on "drug trafficking." He said that he spent the next three months riding with a more experienced officer, which provided both patrol experience and training with "a strong focus on . . . identification of different drugs, narcotics and contraband." Trooper had then had an additional five months of patrol experience following his ride-along experience. Moreover, Trooper testified that he had experience pulling over drivers who had drugs in their cars, as well as drivers who "were later found to have been engaged in the distribution of drugs."

¶23　Officer testified that he had been a police officer for about three and a half years at the time of the trial, meaning he had been an officer for about two and a half years at the time of Prettyman's arrest. When Officer began to offer an expert opinion, Counsel objected based on an asserted lack of foundation for his relevant expertise. Officer then testified that he had experience arresting "[s]everal" people for drugs—some for small quantities or simple possession, including individuals arrested for methamphetamine or heroin use, and some who had "significant amounts" of drugs, whom he had "suspected of being drug dealers" or who "had drugs that they intended to sell." He also testified that based on "a known opioid abuse problem" in the area, "a lot of people" he had taken to jail had "illicit substances on them," including methamphetamine and heroin. He further testified that he had "interview[ed] people [who had] admitted to personal use."

¶24　Based on Trooper's and Officer's respective responses regarding their experience and training related to narcotics use and trafficking, Counsel could have reasonably believed that further objections on these grounds would likely be fruitless because the witnesses could demonstrate sufficient "knowledge, skill, experience, training, or education," Utah R. Evid. 702(a), to allow them to testify as to quantities of methamphetamine and heroin typically possessed for personal use. Furthermore, Counsel could have strategically decided that, rather than further

object and thereby allow the officers to amplify their credibility by relating additional qualifications under questioning by the State,[2] the better strategy would be to highlight weaknesses in their qualifications through cross-examination. *See State v. Carter*, 2023 UT 18, ¶ 63, 535 P.3d 819 (affirming this court's conclusion "that reasonable counsel could decide to challenge the expert's opinion through cross-examination rather than object to the testimony"); *State v. Nunes*, 2020 UT App 145, ¶ 20, 476 P.3d 172 ("Counsel may well have made a reasonable tactical choice in forgoing the objection even if there may have been grounds to object. Thus, the dispositive question is whether counsel's actions fell below an objective standard of reasonableness . . . ." (cleaned up)), *cert. denied*, 485 P.3d 943 (Utah 2021).

¶25    This appears to be the route Counsel chose. When cross-examining Trooper, Counsel attempted to cast doubt on Trooper's testimony by showing that his training was not specific or extensive related to drug use and distribution: "So you receive drug training as one of a multitude of trainings at POST and then you go on a 12-week-ride-along when you cover pretty much everything that a highway patrolman needs to cover in order to do his job? . . . And that's the limit of your training in such matters; correct?" And when he cross-examined Officer, he said, "Now when you talk about personal use or distribution, you're talking about things where you haven't actually seen whether drugs were used for personal use or for distribution. I mean, you've kind of reached the conclusion yourself as to how they were used" and, "[I]n any case where distribution is alleged, often that's denied. And in those cases, you don't have personal knowledge of how the drugs were actually used, do you?" Additionally, Counsel

---

2. Indeed, the objection Counsel did make to Officer's testimony invited the State to elicit additional details regarding Officer's experiences arresting people in possession of narcotics, and the resulting testimony did no favors to Prettyman.

successfully managed to obtain agreement from both Trooper and Officer that it was feasible for a drug user to purchase more than the amounts the officers indicated were typical of personal use if the person was able to afford a longer-term supply. We cannot say that Counsel's decision to not further object to the officers' expert qualifications and, instead, to take the foregoing steps to undermine the strength of their opinions overcomes our "strong presumption that [C]ounsel's actions were within the broad range of conduct considered a sound trial strategy." *State v. Hutchings*, 2012 UT 50, ¶ 18, 285 P.3d 1183 (cleaned up).

B.     Prejudice

¶26     Moreover, Prettyman has not shown that Trooper and Officer actually were not qualified as experts on the subject of drug quantities typically possessed for personal use versus quantities typically possessed for distribution and, therefore, that if Counsel had further objected, they would have been unable to establish their qualifications. Specifically, Prettyman has not sought a remand under rule 23B of the Utah Rules of Appellate Procedure to establish the officers' lack of qualifications. *See* Utah R. App. P. 23B(a) ("A party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel."). Because Prettyman has presented no evidence that either officer was actually unqualified to testify on this subject, we cannot say, on the record before us, that Prettyman was prejudiced by Counsel's decision not to further object based on their asserted lack of qualifications. *Cf. State v. Modes*, 2020 UT App 136, ¶ 28 n.9, 475 P.3d 153 ("[The defendant] has not sought remand pursuant to rule 23B to include an affidavit from any expert proffering the proposed expert testimony he would have introduced at trial, and therefore he cannot demonstrate prejudice by showing that such expert testimony would have helped his defense."). Thus, Prettyman's ineffective assistance claim based on the lack of

further objection to the officers' assertedly insufficient expert qualifications fails both prongs of *Strickland*.

## II. Counsel's Failure to Object that the Expert Testimony Was Anecdotal, Unfounded, and Unreliable

¶27 Prettyman also asserts that he received ineffective assistance when Counsel did not object to Trooper's and Officer's expert opinions on the basis that they lacked adequate foundation. Specifically, citing *State v. Rammel*, 721 P.2d 498 (Utah 1986), and related cases, Prettyman contends that Trooper's and Officer's respective opinions regarding drug quantities typically possessed for personal use versus quantities typically possessed for distribution were not based on sufficient facts or data because neither witness offered "testimony about how many drug *distribution* arrests he had done or the quantity of drugs he had seen in those arrests and how they compared to data on possession cases" and because neither witness offered "testimony about how many drug *possession* arrests he had done" (apart from Officer's testimony that he had done "several") or "how the quantity of drugs he had seen in those arrests compared to data on possession cases." Again, we disagree.

¶28 Rule 702(b) of the Utah Rules of Evidence states, "Scientific, technical, or other specialized knowledge may serve as the basis for expert testimony only if there is a threshold showing that the principles or methods that are underlying in the testimony . . . are reliable, . . . are based upon sufficient facts or data, and . . . have been reliably applied to the facts." Utah R. Evid. 702(b). In *Rammel*, applying the predecessor to rule 702(b), our supreme court concluded that a detective's expert testimony in that case was improperly admitted. 721 P.2d at 500–01. The detective had testified that "[b]ased on his experience interviewing several hundred criminal suspects, . . . no criminal suspect ever admitted 'right off the bat' to committing a crime" and that "because most suspects lie when initially questioned by police, it

would not have been 'unusual' for [the defendant] to lie during the first police interrogation." *Id.* at 500. The court concluded that a foundation for this testimony was "utterly lacking" because "[t]here was no showing that the anecdotal data from which the detective drew his conclusions had any statistical validity."[3] *Id.* at 501.

¶29    We disagree with Prettyman that such a showing was missing here. The requirement that anecdotal data be shown to have statistical validity could be interpreted in two ways: it could mean that expert witnesses must show they have collected enough data points for their conclusions to be statistically significant, or it could mean that they must show that the data is of the type that makes statistical analysis possible. It cannot be that the *Rammel* court viewed the detective's expert opinion in that case to lack foundation due to an insufficient sample size of anecdotal data, because the detective in *Rammel* testified that he had performed hundreds of criminal interviews—certainly an adequate pool of experiences to draw from. *Id.* at 500. Instead, the problem with the detective's evidence was that he was attempting to make statistical inferences from data about something that was unquantifiable: another person's truthfulness. *See id.* The detective could not have determined what quantity of truthfulness a particular suspect had demonstrated or what

---

3. The *Rammel* court determined that the detective's expert testimony in that case lacked foundation for the additional reason that the State had not produced "any evidence to establish that [the detective's] experience uniquely qualified him as an expert" on the topic at issue. *State v. Rammel*, 721 P.2d 498, 501 (Utah 1986). We have already addressed the expert qualifications of Trooper and Officer in this case and shown that Counsel did not perform deficiently by not objecting to their opinions on the foundational ground that they were not qualified to give them. *See supra* ¶¶ 19-25.

amount of veracity was typical of a suspect in an initial interrogation, so his attempt to infer something about a later defendant's truthfulness from prior suspects' unquantifiable honesty was not statistically valid. Later cases have confirmed this reading. For example, in *State v. Iorg*, 801 P.2d 938 (Utah Ct. App. 1990), this court characterized *Rammel* and other cases as "condemn[ing] anecdotal 'statistical' evidence concerning matters not susceptible to quantitative analysis such as witness veracity." *Id.* at 941; *see also State v. Quas*, 837 P.2d 565, 568 (Utah Ct. App. 1992) ("Both *Rammel* and *Iorg* condemn the use of evidence concerning matters not susceptible to quantitative analysis such as witness veracity . . . ." (cleaned up)), *cert. denied*, 853 P.2d 897 (Utah 1992).

¶30 The problem with the expert evidence in *Rammel* is absent here. Trooper and Officer did not testify of an unquantifiable concept like truthfulness but of measurable quantities of drugs possessed by persons who clearly, and often admittedly, possessed the drugs for personal use. This type of testimony is capable of bearing statistical validity. And while rule 702(b) also requires "a threshold showing that the principles or methods that are underlying in the testimony . . . are based upon sufficient facts or data," *see* Utah R. Evid. 702(b), Counsel was not ineffective for believing that the State had satisfied or could satisfy that requirement. There is no magic number of data points an expert witness is required to provide, and both Trooper and Officer indicated that their opinions as to "common" quantities of drugs possessed for personal use were based on multiple arrests.

¶31 Furthermore, Prettyman is wrong in asserting that Trooper and Officer failed to testify as to the exact quantities of drugs they had seen for personal use versus distribution. Officer said that "upon interviewing people [who] have admitted to personal use, commonly seen . . . is a half gram to a gram" of methamphetamine or heroin. And Trooper stated that it was his experience that users

typically possessed one gram of such drugs. Officer also testified about one suspect he had arrested whose methamphetamine "weighed out to be 2.2 ounces," and he also testified that he had "recently arrest[ed] somebody that [had] approximately . . . 12 grams of methamphetamine that claimed it was their personal use." Each of these statements offered specific, quantifiable data points to the jury.

¶32 In sum, Counsel did not perform deficiently by not objecting for lack of foundation because it was reasonable to conclude that Officer's and Trooper's testimonies satisfied the foundational requirements.

### III. Counsel's Failure to Object that the Expert Testimony Was More Prejudicial than Probative

¶33 Next, Prettyman contends that Counsel should have objected to Trooper's and Officer's expert opinions because they were "more prejudicial than probative" and that because Counsel did not object on this basis, Prettyman, again, received ineffective assistance. And again, we disagree.

¶34 Under rule 403 of the Utah Rules of Evidence, a court "may exclude relevant evidence if its probative value is *substantially* outweighed by a danger of . . . *unfair* prejudice." Utah R. Evid. 403 (emphases added). Prettyman argues that the probative value of Trooper's and Officer's opinions on drug quantities typically possessed for personal use "was nil," asserting, "The jury did not need it. It already had photos and videos of the impounded drugs, photos of and testimony about the paraphernalia, and testimony from a State Crime Lab employee regarding the weight of the drugs and that the drugs were methamphetamine and heroin." Prettyman continues, "To properly consider whether [Prettyman] intended to distribute the drugs, the jury did not also need unfounded, unreliable testimony that the drug amounts in [his] possession were not 'normal' or 'typical' for addicts."

¶35    Prettyman's assertion of unfair prejudice seems to derive from his contention that the officers' opinions were unfounded and unreliable, but—as we discussed above—they were not. *See generally State v. Wilson*, 2020 UT App 30, ¶ 30, 461 P.3d 1124 ("[A]ll probative evidence, to some degree, tends to affect the outcome. That's why it's considered probative. But if that is the only manner in which a piece of evidence can be considered 'prejudicial,' its prejudice is by definition not unfair."), *cert. denied*, 466 P.3d 1075 (Utah 2020). And the fact that the jury had other evidence establishing the quantities of drugs Prettyman possessed did not negate the probative value of Trooper's and Officer's opinions. Without expert testimony, the jury would not know the significance of those amounts, including whether the amounts were higher or lower than those typically associated with personal use. Indeed, as we have noted, the type of expert testimony Trooper and Officer supplied has been specifically identified as helpful evidence for the factfinder to have in these types of cases. *See State v. Bankhead*, 514 P.2d 800, 803 (Utah 1973) ("Experienced officers may give their opinions in cases involving possession of heroin that the narcotics are held for purposes of sale based upon such matters as the quantity, packaging, and normal use of an individual; convictions based on such testimony have been upheld."). We are not convinced that any unfair prejudice that may have resulted from this evidence outweighed its probative value, much less that it *substantially* did so.[4]

---

4. We acknowledge that this is a type of evidence from which some amount of unfair prejudice could potentially result. In *State v. Rammel*, 721 P.2d 498 (Utah 1986), our supreme court said that "even where statistically valid probability evidence has been presented," "probabilities cannot conclusively establish that a single event did or did not occur and are particularly inappropriate when used to *establish* facts not susceptible to quantitative analysis, such as whether a particular individual is

(continued…)

telling the truth at any given time." *Id.* at 501 (emphasis added) (cleaned up). Thus, the *Rammel* court was concerned with both (1) anecdotal evidence that is statistically problematic because it is *based on* observations of things not susceptible to quantitative analysis, like witness veracity (a circumstance not present here, *see supra* ¶ 30), and (2) statistically valid anecdotal evidence being used to *establish* a fact not susceptible to quantitative analysis (a circumstance that may be present here since a person's subjective intent to distribute drugs is not necessarily susceptible to quantitative analysis). *See id.* Based on this second concern, subsequent to *Rammel* our supreme court named "statistical evidence of matters not susceptible to quantitative analysis, such as witness veracity," as a category of evidence for which the ordinary presumption of admissibility under rule 403 of the Utah Rules of Evidence shifts. *State v. Dibello*, 780 P.2d 1221, 1229 (Utah 1989).

Here, however, Prettyman does not ask us to shift the rule 403 presumption. His argument goes no further than his statement that "as with all evidentiary proffers, evidence based on 'anecdotal statistical experience' offered without foundation must be more probative than prejudicial." And the only authority he cites is rule 403 itself. Thus, we have employed the ordinary presumption of admissibility under rule 403.

But even if Prettyman had asked us to employ a burden shift, we would not have been inclined to do so. In *Dibello*, our supreme court identified two other categories of evidence to which a rule 403 burden shift should apply—"gruesome photographs of a homicide victim's corpse" and "a rape victim's past sexual activities with someone other than the accused." *Id.* Yet there has since been a full or partial retreat from applying a burden shift to those categories of evidence. *See Met v. State*, 2016 UT 51, ¶ 83, 388 P.3d 447 ("The gruesomeness test . . . distract[s] from the plain language of the Utah Rules of Evidence. Admissibility of

(continued…)

Therefore, Counsel did not perform deficiently for not objecting on these grounds.

### IV. Counsel's Failure to Object that Trooper Provided a Legal Conclusion

¶36 Finally, Prettyman maintains that Counsel was ineffective for not objecting to a statement made by Trooper that Prettyman claims provided a legal conclusion. We conclude that there is no reasonable probability that the outcome of trial would have been any better for Prettyman in the absence of Trooper's statement and, therefore, that this ineffective assistance of counsel claim also fails.

¶37 Rule 704 of the Utah Rules of Evidence states, "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those

---

allegedly gruesome materials should be assessed without the gloss that we have placed upon rule 403."); *State v. Rallison*, 2023 UT App 34, ¶ 25 n.7, 528 P.3d 1235 (indicating that "we are not certain whether" a rule 403 burden shift "continues to be applicable" to evidence of a rape victim's past sexual activities with someone other than the accused and that "we wait for the supreme court to weigh in on this issue"). Moreover, our case law regarding the use of drug quantity evidence to prove intent to distribute contains no hint of a need to employ a burden shift in this context. *See State v. Bankhead*, 514 P.2d 800, 803 (Utah 1973) ("Experienced officers may give their opinions in cases involving possession of heroin that the narcotics are held for purposes of sale based upon such matters as the quantity, packaging, and normal use of an individual . . . ."); *State v. Warner*, 788 P.2d 1041, 1043 n.2 (Utah Ct. App. 1990) ("The quantity of a drug may be a factor in determining that it was possessed for sale rather than for personal use.").

matters are for the trier of fact alone." Utah R. Evid. 704(b). During direct examination, the State asked Trooper, "[S]o in your training and experience[,] . . . with the fanny pack, the cash inside with all the little separate baggies and the presence of these big chunks of this dark substance and then all this crystal-like substance, all that combined together, in your training and experience what does that lead you to believe?" Trooper responded, "That it was distribution. It was way more than a normal everyday user would use." Prettyman contends that the statement "it was distribution" was an improper legal conclusion based on the element of Prettyman's charges requiring the State to prove that Prettyman had the intent to distribute the illegal substances he possessed. *See* Utah Code § 58-37-8(1)(a) ("[I]t is unlawful for a person to knowingly and intentionally . . . possess a controlled or counterfeit substance with intent to distribute . . . .").

¶38 Even assuming, without deciding, that this statement constituted an improper legal conclusion, *see generally Colosimo v. Gateway Cmty. Church*, 2016 UT App 195, ¶ 33, 382 P.3d 667 ("There is no bright line between opinions that [permissibly] embrace an ultimate issue and those that provide an impermissible legal conclusion." (cleaned up)), *aff'd*, 2018 UT 26, 424 P.3d 866, Prettyman was ultimately not prejudiced when Counsel did not object to it. "[W]here testimony is merely cumulative, we are disinclined to find prejudice even when the testimony was improperly admitted." *State v. Jones*, 2020 UT App 31, ¶ 35, 462 P.3d 372. And Prettyman does not assert that other testimony making the same point as Trooper's "it was distribution" testimony amounted to an impermissible legal conclusion. Specifically, Officer testified,

> I remember recently arresting somebody that did have approximately . . . 12 grams of methamphetamine that claimed it was their personal use. But still, if we take into consideration the situation that we're here for today, even if you

> look at someone having 13 grams of methamphetamine compared to somebody having 40, almost 50 grams of methamphetamine, that would still lead me to believe that that can't be used for personal use.

This statement—as much as the statement at issue—supported the conclusion that the quantity of drugs Prettyman possessed was simply too great for it to be believable that he possessed them merely for personal use. Furthermore, both Trooper and Officer testified that, in their experience, drug users typically possessed between a half gram to a gram for personal use. While Prettyman has argued that Counsel should have objected to those statements, he has not convinced us that those statements should have been excluded. Accordingly, the jury had before it multiple sources of evidence it could consider besides Trooper's statement that "it was distribution" indicating that the quantities of drugs Prettyman possessed were significantly larger than those typically possessed for personal use.

¶39 Because the statement that Prettyman asserts was an improper legal conclusion is merely cumulative of this other evidence, the jury was likely to reach the same conclusion regardless of whether that statement was excluded. And because there is no likelihood of a better outcome for Prettyman had Counsel taken the action Prettyman now contends he should have, Prettyman was not prejudiced by Counsel's inaction on this point.[5]

---

5. Prettyman also argues that this court "should compound the errors here and reverse under the cumulative error doctrine." But the cumulative error doctrine does not apply here because we have determined that Counsel did not perform deficiently with regard to the first three of Prettyman's four claims of error and

(continued…)

CONCLUSION

¶40     Prettyman has not borne his burden of persuasion on any of his ineffective assistance of counsel claims, and we therefore affirm his convictions.

———————

that the allegedly deficient performance in the fourth claim resulted in no prejudice to Prettyman. *See State v. Martinez-Castellanos*, 2018 UT 46, ¶ 40, 428 P.3d 1038 ("We have repeatedly held that the [cumulative error] doctrine will not be applied when claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm. In other words, the doctrine will only be applied to [multiple] errors that are substantial enough to accumulate." (cleaned up)).