2025 UT App 79

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DAMON JAY MARSHALL,
Appellant.

Opinion
No. 20230383-CA
Filed May 22, 2025

Second District Court, Ogden Department
The Honorable Reuben J. Renstrom
No. 201900185

Freyja Johnson, Hannah Leavitt-Howell, and
Mikayla Irvin, Attorneys for Appellant

Derek E. Brown and Natalie M. Edmundson,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN D. TENNEY
concurred.

MORTENSEN, Judge:

¶1     Damon Jay Marshall did not show up on time for his own trial, where he was being tried before a jury for possession of a controlled substance with the intent to distribute. The judge conferred briefly with counsel about Marshall's absence and decided to start the trial in absentia. About fifty minutes in, Marshall appeared and was present for the rest of the trial. At trial, a police sergeant opined that the amount of heroin Marshall was carrying suggested that he possessed the drug "with the intent to distribute." Marshall's counsel never objected to this statement. Marshall was convicted and now appeals, arguing that

the court erred when it began the trial in his absence and that his trial counsel was ineffective for not objecting to the sergeant's opinion about the intent to distribute. Because Marshall was not ultimately prejudiced by either alleged error, we affirm his conviction.

BACKGROUND

¶2     While conducting surveillance on a known drug house, police officers saw a car parked in front. They followed the car when it left, and when the driver crossed the center double-yellow line several times, the officers activated their emergency lights and pulled the car over.

¶3     Two officers approached the car, which had three occupants—Marshall was driving with two passengers. The odor of marijuana wafted from the car when Marshall rolled down the window. One officer told Marshall to put the car in park, but Marshall did not comply. Instead, he argued with the officer and kept reaching toward the right pocket of his pants. When Marshall eventually got out of the car at the officers' request, he refused to put his hands on his head or behind his back.

¶4     The officers arrested Marshall. A search revealed Marshall had three bags of heroin, a marijuana roach, and two oxycodone pills in his pants pockets. One of the bags of heroin contained fifteen "small baggies of heroin." Marshall was charged with possession of a controlled substance with the intent to distribute.

¶5     The case proceeded to a jury trial. Marshall was absent when the trial was set to begin at 9:00 a.m. A half hour later, the trial judge stated, "It is now almost 9:30. The trial was to begin at 9:00. The defendant has not appeared. There has not been any indication as to where the defendant is. I've also put word out throughout the building and he hasn't called in."

¶6    The State moved to "proceed in absentia," with the prosecutor stating, "We think he's voluntarily decided not to appear today." Marshall's counsel (Counsel) opposed the motion, arguing, "There's no evidence he voluntarily absented himself. We feel that the Court . . . should strike the trial and have the Court issue a warrant to find out why he's not here." Notably, Counsel had not brought his office cell phone to court because he knew he would not be able to answer calls during the trial.

¶7    The trial judge sided with the State: "I'm going to grant the motion. When and if he does appear, we'll get to the bottom of that. But where we do have a jury who's already here, we'll . . . go ahead with it today and see where the jury lands. And if he shows up in the meantime, then we'll cross that bridge when we get there." The trial then proceeded.

¶8    The State began to present its case. It first called the officer (Officer) who searched Marshall after his arrest. He testified that he found the three bags of heroin, the marijuana roach, and the two oxycodone pills on Marshall. After Counsel cross-examined Officer, the State then called a forensic scientist from the state crime lab. She testified that the substance in the bags, which weighed between six and seven grams in total, tested positive for heroin.

¶9    At that time, which was about fifty minutes after the trial had started, the court called the prosecutor and Counsel for a sidebar to let them know Marshall had arrived.[1] The following exchange took place:

> *Court*: I think the defendant is here. I just wanted to
>     let you know your client is here. So I don't know
>     how you want to handle that.

---

1. The minute entry indicates that the jury was seated at 9:30 a.m. and the sidebar started at 10:21 a.m.

> *Prosecutor*: Have him come up and be seated.
>
> *Counsel*: Yeah.
>
> *Court*: Okay. I don't want to make any more fanfare, obviously, than necessary. . . . So he's already taking a seat in the back, so you may want to grab him and bring him up.

The sidebar ended and a chair was found for Marshall to use, presumably at the defense table beside Counsel. The forensic scientist finished testifying, and the State recalled Officer for the purpose of identifying Marshall as the person he had searched.

¶10 The State's final witness was a sergeant (Sergeant), whom the State characterized as an "expert witness as it relates to possession of controlled substances, specifically possession with intent."[2] After reciting his credentials, Sergeant testified that the total amount of heroin found on Marshall—6.9 grams—would yield about seventy doses of the drug. He further testified that the individual baggies of heroin found on Marshall were "known as 20 Sacks" on the street because they sold for about twenty dollars each. Sergeant described the amount of heroin in the other two bags as a "medium sized quantity." When asked what "having different quantities" meant to him, Sergeant responded, "[S]o with the different quantities, you see them distributed sometimes in different weights. So this all suggests to me that this individual was in possession of this heroin with the intent to distribute because . . . of the different packaging and the different weights." He went on to say that individuals typically "don't purchase a large amount and then plan on divvying that out for themselves" over seventy days, suggesting "distribution" was in play here. He explained that drug dealers generally "purchase a large amount [of contraband] and sell it on the street [as] single dosage units,"

---

2. Sergeant was not one of the officers involved in searching Marshall when he was arrested.

up-charging for the "lower dosage units" in order to maximize their profit.

¶11 On cross-examination, Counsel asked Sergeant if he had ever "run into anybody" who had the amount of heroin found on Marshall for personal use. Sergeant said that he had not. But Counsel pressed on:

> *Counsel*: And you don't know that some people might not buy in bulk, because it is cheaper, and [to] keep a supply on hand?
>
> *Sergeant*: [A]gain, in my experience, I've never run into an individual like that.
>
> *Counsel*: But it's possible—it's completely possible that just because you haven't run into it, doesn't mean it doesn't happen?
>
> *Sergeant*: Anything's possible, sir.

¶12 Marshall elected not to testify and called no witnesses. The jury convicted him as charged.

¶13 After the guilty verdict, the State asked that Marshall be taken into custody to await sentencing, arguing that Marshall "may not show up for sentencing" since he had been late for the trial and hadn't shown up for a pretrial conference. Counsel opposed the request, arguing that Marshall had called in the past when he was going to be late and that he may have been unable to contact him because Counsel did not have his office cell phone with him. Counsel explained, "But he has . . . contacted us [in the past] during jury selection, let us know what the problem was. He had some automobile problems. He's coming up from Salt Lake."

¶14 Before ruling on the State's motion, the court interviewed Marshall as to the reason for his tardiness, resulting in the following exchange:

*Court*: Let me just ask, what were your car problems today, Mr. Marshall?

*Marshall*: Well, I bought a vehicle last week, and I've been having issues with it starting and continue running—staying running. So it wasn't staying running. And I attempted to get here, and it died with me on the freeway again. I have a code reader that I've been putting the codes in. And it's got a code reader stating that it's got an ignition module, that it needs a solenoid that needs replaced, and I didn't have that—I didn't have the means for that.

My son has been patient with me and willing to help me with that. And [my son and his girlfriend are] going to take me. And they wanted to come anyways. I asked them . . . if the car is not willing to stay running, would he be able to shuttle me up here?

*Court*: Okay. So I guess the problem I'm having is it sounds like you were relying upon an inherently unreliable car.

*Marshall*: I thought I'd fixed the problem. And the code came up as probably not the ignition module. It's a different code that popped up. It's showed a catalytic problem. It may be a catalytic converter or a misfire of some sort.

*Court*: Well, I tend, at this point, to agree with the State. . . . [T]here's going to be a series of things that he would have to come to Ogden for to meet with AP&P to get the PSI done and then to get here on time to court. And so rather than prolong those things, it is the Court's intention to take him into custody today.

. . . .

My biggest problem is, is this is a pretty big deal today. I mean, you've been charged with a first-degree felony and you showed up an hour and a half late to your own trial on a first-degree felony.

. . . .

So I'm trying to put your story together, [and it] does not really resonate with the Court. Because, I had a car that was inherently unreliable. I had a son who was planning on coming in any regard. Why not just put that car that wasn't working to the side in its entirety and rely completely on a son who was already intending to come, is the inherent question that I still don't have resolved in my mind.

So it is—I appreciate what everybody is saying, but I am going to take him into custody.

Marshall was subsequently sentenced to a prison term of five years to life.

ISSUES AND STANDARDS OF REVIEW

¶15    Marshall appeals, asserting that the district court erred when it began the trial in his absence. "Whether the trial court's inquiry regarding the voluntariness of a defendant's absence was properly conducted" is a question of law reviewed for correctness. *State v. Pando*, 2005 UT App 384, ¶ 13, 122 P.3d 672 (cleaned up); *see also State v. Wanosik* (*Wanosik I*), 2001 UT App 241, ¶ 8, 31 P.3d 615, *aff'd*, 2003 UT 46, 79 P.3d 937. 2001. Whether a defendant is voluntarily absent is a question of fact, *Pando*, 2005 UT App 384, ¶ 13; *see also State v. Wanosik* (*Wanosik II*), 2003 UT 46, ¶ 15, 79 P.3d 937 ("[T]he question of voluntariness is highly fact-

dependent . . . ."), which is reviewed for clear error, *see In re Jacobson*, 2019 UT App 56, ¶ 23, 441 P.3d 761.

¶16 Marshall also asserts that Counsel was ineffective for not objecting to Sergeant's opinion that the amount of heroin that he possessed suggested an intent to distribute. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Guerro*, 2021 UT App 136, ¶ 25, 502 P.3d 338 (cleaned up).


ANALYSIS

I. Trial in Absentia

A.     The Inquiry

¶17 Marshall argues that the district court "erred when it granted the State's motion to hold the trial in absentia without requiring the State to show any evidence that [he] had voluntarily chosen to be absent from trial."

¶18 "A defendant charged with a crime is entitled to be present at all stages of trial." *State v. Houtz*, 714 P.2d 677, 678 (Utah 1986) (per curiam); *see also* Utah Const. art. I, § 12 ("In criminal prosecutions the accused shall have the right to appear and defend in person and by counsel . . . ."); Utah Code § 77-1-6(1)(a) ("In criminal prosecutions the defendant is entitled . . . [t]o appear in person and defend in person or by counsel . . . ."). "The right to appear and defend in person is a constitutional one, but may be waived under certain circumstances if the defendant voluntarily absents himself from the trial. However, that voluntariness may not be presumed by the trial court." *Wanosik II*, 2003 UT 46, ¶ 13, 79 P.3d 937 (cleaned up).

¶19 It is impermissible to apply "an automatic presumption of voluntariness . . . based on nothing more than non-appearance at a hearing of which a defendant had notice." *Id.* ¶ 15. "Instead, the question of voluntariness is highly fact-dependent, is tied to the totality of circumstances in particular cases, and, where there is virtually no explanation for an absence, requires some form of inquiry by the trial court." *Id.* "The prosecution, which must bear the burden of proof regarding waiver, would be well served to assist the court in its inquiry by providing at least some minimal evidence that the defendant" is voluntarily absent. *Id.*; *see also State v. Ross*, 655 P.2d 641, 642 (Utah 1982) (per curiam) (stating that "no one denies the general principle" that "the onus is on the State to show voluntariness of absence and lack of consent to a trial in absentia" (cleaned up)); *State v. Wagstaff*, 772 P.2d 987, 990 (Utah Ct. App. 1989) ("The state carries the burden of showing voluntariness.").

¶20 Our supreme court has laid out this course for conducting an adequate inquiry into the voluntariness of a defendant's absence:

> In the average case, the trial court may simply instruct defense counsel to attempt to contact the defendant or persons familiar with the defendant to see if an explanation for the non-appearance emerges, and the prosecutor to ascertain if the defendant is incarcerated . . . . Once inquiry appropriate to the case has been made, and a compelling reason for the defendant's absence remains unknown, voluntariness may then be properly inferred.

*Wanosik II*, 2003 UT 46, ¶ 15 (cleaned up).

¶21 Here, the problem with the court's inquiry to determine if Marshall was voluntarily absent is twofold. First, the court never

required the State to provide any evidence that Marshall's absence was voluntary. *See Wanosik I*, 2001 UT App 241, ¶ 22, 31 P.3d 615 ("[T]he State must make a preliminary showing, based on reasonable inquiry, that [the] defendant's absence is voluntary."), *aff'd*, 2003 UT 46, 79 P.3d 937. Instead, the court accepted at face value the prosecutor's unsupported conclusion that "[w]e think [Marshall has] voluntarily decided not to appear today," despite Counsel pointing out that there was "no evidence [Marshall] voluntarily absented himself." The court appears to have limited its inquiry to not hearing from Marshall after having "put word out throughout the building" that he was due in court and on the prosecutor's personal belief that Marshall had voluntarily decided to not attend his trial. The court stated that "[w]hen and if" Marshall did appear, it would "get to the bottom of that." But the court reasoned that since the jury was already seated, the trial would proceed in absentia and it would "see where the jury lands." And the court reiterated that if Marshall showed up after the trial started, "then we'll cross that bridge when we get there."

¶22    But that's not how the court was supposed to make its decision to proceed in absentia. Instead of presuming that Marshall was voluntarily absent based on the prosecutor's hunch, the court was required to conduct a reasonable inquiry before making such a determination. *Wanosik II*, 2003 UT 46, ¶ 15. Here, the inquiry the court conducted was inadequate because it did not involve either the State or Counsel trying to find out where Marshall was, thus suggesting that, at the time, "nothing more than that no one knew why [Marshall] was absent" was required. *See Wanosik I*, 2001 UT App 241, ¶ 20. And with "no reliable information on the voluntariness of [Marshall's] absence, the trial court merely *assumed* that [Marshall's] absence was voluntary." *See id.* In other words, Marshall's non-appearance and the court's somewhat passive effort of putting "word out throughout the building" was not enough for the court to go on since "the question of voluntariness is highly fact-dependent" and "tied to

the totality of circumstances." *Wanosik II*, 2003 UT 46, ¶ 15. And "where there is virtually no explanation for an absence"—as was the case here—the district court is required to conduct "some form of inquiry," which, as our supreme court has indicated, in the average case would at a minimum include an effort to contact missing defendants and to ensure they are not incarcerated. *Id.* Because the State bore the burden of proof to show Marshall was voluntarily absent, it should have assisted the court in making the inquiry beyond merely speculating that Marshall "voluntarily decided not to appear" at trial.[3] At the very least, the court could

---

3. On appeal, the State argues, "Most of the court's inquiry into Marshall's absence, including a conversation with defense counsel and the prosecutor, was done off the record. Thus, the full extent of that conversation, and any efforts to inquire into Marshall's absence, is largely unknown." From this lack of record, the State asserts that "Marshall relies on an inadequate record in making" the claim that the inquiry into his absence was inadequate. The State's argument here falls short in two respects. First, we have explained when "no direct inquiry by the trial court appears in the record," we will conclude that "the record reflects that the trial court erred by failing to make an adequate inquiry into whether [a defendant] was voluntarily absent before proceeding with trial in absentia." *State v. Gunter*, 2013 UT App 140, ¶ 26, 304 P.3d 866 (cleaned up). Second, the State bore "the burden of proof regarding waiver" to show that Marshall was voluntarily absent. *Wanosik II*, 2003 UT 46, ¶ 15, 79 P.3d 937. If the State had indeed carried this burden—which it should have been aware of given our case law—it should have ensured that its efforts to assist the district court in conducting the inquiry into Marshall's absence appeared on the record. Instead of concluding that the record lacked the details of the efforts made relevant to the inquiry, we determine a more likely scenario—especially given the standard articulated in *Gunter*—is that the record

(continued…)

have had Counsel—who was the person most likely to be able to find Marshall—attempt to contact Marshall and could have had the prosecutor separately verify that Marshall was not incarcerated. *See id.* Only after making an appropriate inquiry and finding no compelling reason for Marshall's absence would the district court have been allowed to properly infer that Marshall was voluntarily absent. *Id.* Instead of relying on its inherently faulty inquiry, the court should have taken a break to allow Counsel and the prosecutor to gather the information necessary for it to make a sound decision. *See Wanosik I*, 2001 UT App 241, ¶ 22 ("When neither court nor counsel have information as to why the defendant is not present, a continuance will ordinarily be required to allow the prosecution and defense counsel an opportunity to inquire into the defendant's whereabouts and the reasons for his absence."); *see also Wanosik II*, 2003 UT 46, ¶ 15 ("It is true that continuances . . . will occasionally be required, but they need not be of long duration, and we think fairness and constitutional procedure require them.").

¶23    A second problem with the district court's inquiry is that it substantively took place after the fact and in the context of determining whether Marshall should be taken into custody before sentencing. Our case law clearly indicates that the inquiry is to take place before the court makes a decision to proceed in absentia based on voluntariness. *Wanosik II*, 2003 UT 46, ¶ 15. Moreover, the district court's after-the-fact inquiry was conducted not to determine if Marshall was voluntarily absent but instead to determine whether he should be held in custody prior to sentencing. The prosecutor argued that the "record" indicated Marshall "may not show up for sentencing" because he had been late or not shown up for proceedings in the past. The court then asked Marshall about the car problems he had on the day of trial.

---

accurately reflected the lack of an adequate inquiry. *See* 2013 UT App 140, ¶ 26.

The court opined that it perceived Marshall as "relying upon an inherently unreliable car." The court then observed that Marshall was going to have to travel to Ogden several times to meet with Adult Probation and Parole and get to court in connection with sentencing. Given Marshall's history of being late, the court decided to take him into custody to avoid additional delays. Thus, it's clear that the court never addressed whether Marshall was voluntarily absent from trial. Instead, it was determining whether it was likely that Marshall would be able to appear at future proceedings given his transportation issues. We have a difficult time equating the court's inquiry after trial to determine whether Marshall could be counted on to show up in the future with whether Marshall was voluntarily absent in the past when his trial began, which is the moment critical to the question before us in this appeal.

¶24 In sum, the district court did not make a valid determination as to whether Marshall was voluntarily absent because it never undertook an adequate inquiry to support that conclusion. The court had no relevant evidence of voluntariness because no adequate inquiry was undertaken prior to determining Marshall was voluntarily absent. And the inquiry—such as it was—that took place was conducted after the fact and to decide whether Marshall should be held in custody prior to sentencing. Accordingly, the district court erred in concluding that Marshall was voluntarily absent at the outset of trial.

B.     Prejudice

¶25 Given the court's inadequate inquiry into whether Marshall was voluntarily absent, we must next consider whether this shortcoming harmed Marshall. A district "court's error in failing to conduct an adequate inquiry into whether a defendant's absence was voluntary does not merit reversal . . . unless the defendant was prejudiced by the lack of adequate inquiry." *Wanosik I*, 2001 UT App 241, ¶ 26.

¶26 Our supreme court recently clarified that there are "three categories of standards for proving prejudice" for constitutional errors. *State v. Chadwick*, 2024 UT 34, ¶ 47, 554 P.3d 1098. The first is "reserved for structural errors, which are defects that affect the framework within which the trial proceeds." *Id.* (cleaned up). Such "constitutional errors in criminal cases constitute per se prejudice." *Id.* The second category is for "other constitutional errors" that "carry a presumption of prejudice." *Id.* ¶ 48. This presumption "may be rebutted if the State proves that the error was harmless beyond a reasonable doubt." *Id.* "The third class of constitutional errors requires that the defendant establish prejudice." *Id.* ¶ 49. This category typically includes "unpreserved claims of error and ineffective assistance of counsel claims." *Id.* (cleaned up). In *Chadwick*, our supreme court was considering a Unanimous Verdict Clause error. *Id.* ¶ 50. The court concluded that such errors fall under the second category because neither party had suggested that such an error was structural, *id.* ¶ 53, and "a unanimity error is not the type of error that, by its nature, cannot be brought for the first time before a district court," *id.* ¶ 54.[4] The second category, the court observed, "acts as a catch-all for most constitutional errors that do not fit the other two categories." *Id.* ¶ 55. "[A]ttaching a rebuttable presumption is an appropriate safeguard" when the error involves a "serious constitutional concern." *Id.* ¶ 56.

¶27 So it is here. The right to appear is a "serious constitutional concern" that "implicates the right to a fair trial as well as an explicit constitutional guarantee." *See id.* This was the very stance this court has elsewhere suggested applies to a prejudice analysis concerning a district court's failure to adequately inquire into a defendant's failure to appear. *See State v. Gunter*, 2013 UT App 140, ¶ 27 n.7, 304 P.3d 866 ("The United States Supreme Court

---

4. At oral argument, appellate counsel explicitly affirmed that Marshall does not allege the error here was structural.

applied a higher standard when determining whether a trial court's constitutional error could be considered harmless, noting that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was *harmless beyond a reasonable doubt*." (cleaned up)). Accordingly, we conclude that a district court's failure to conduct an adequate inquiry into a defendant's absence creates "a presumption of prejudice that may be rebutted if the State proves that the error was harmless beyond a reasonable doubt." *See Chadwick,* 2024 UT 34, ¶ 48.

¶28 There are two levels of prejudice at play in this case. The first concerns whether the court's inadequate inquiry harmed Marshall when he was presumed to be voluntarily absent though his absence might have been involuntary. The second concerns whether the inadequate inquiry that resulted in proceeding in absentia prejudiced Marshall by having an impact on the verdict.

¶29 While we are sympathetic to Marshall's claim that had the district court conducted a proper—and timely—inquiry, then it would have determined Marshall was involuntarily absent due to transportation issues, that is not the harm that ultimately matters under the circumstances of this case. Even though the district court erred in declaring Marshall voluntarily absent, the harm analysis must extend beyond this discrete action to consider whether proceeding in absentia had a discernible impact on the verdict reached by the jury. And for this overarching level of prejudice, the State has met its burden to show that the error was harmless beyond a reasonable doubt.

¶30 Marshall argues that he was prejudiced in several ways when the court proceeded in absentia. First, Marshall asserts that there is a "reasonable likelihood" that his absence "materially affected the evidentiary picture." Specifically, Marshall suggests that he "may have decided to testify" if he had been present to hear "Officer's testimony about the arrest." Next, Marshall argues that the "judge felt differently about [him] because he was late to

trial," suggesting that the perception that he was not taking his trial seriously led the court to not call a recess when he arrived. He asserts that doing so would have minimized the attention drawn to his late arrival. Marshall thus claims that allowing his late arrival to be on full display affected the jury's evaluation of him and his case by causing its members to view him negatively.

¶31 The State effectively rebuts the presumption of prejudice by showing that starting the trial in absentia was harmless beyond a reasonable doubt. As to the suggestion that Marshall might have testified had he heard Officer's testimony, that possibility was remote at best. As the State points out, Marshall's defense was that he purchased the heroin in bulk to use over time. And given this defense, any decision not to testify was likely made long before the day of trial and would have nothing to do with Marshall not hearing Officer's testimony. Moreover, testimony from Marshall that he possessed a large quantity of heroin for personal use would have opened the door for rebuttal evidence that Marshall was in the process of arranging to sell the drugs.[5]

¶32 Regarding Marshall's tardiness causing the jury to view him negatively, there is little doubt that being late to one's own trial is not a great way to make a good impression. Thus, the jury might well have thought less of Marshall because he showed up late for his trial. But it was not a bad impression that convicted Marshall; instead it was the overwhelming evidence that he planned on selling the heroin found on him. Indeed, "the question of the evidence's strength is clearly the most plausible path for the State to argue harmlessness beyond a reasonable doubt." *State v. Soto*, 2022 UT 26, ¶ 101, 513 P.3d 684; *see also State v. Crowley*, 2014

---

5. During the preliminary hearing, Officer testified that a search of a passenger's cell phone when Marshall was arrested revealed a "discussion of the sale of narcotics" between that passenger and another person, and only Marshall had a distribution quantity of drugs in his possession.

UT App 33, ¶ 17, 320 P.3d 677 ("When considering whether an error was harmless beyond a reasonable doubt, we consider, among other factors, the overall strength of the State's case. The more evidence supporting the verdict, the less likely there was harmful error." (cleaned up)); *United States v. Lloyd*, 269 F.3d 228, 241 (3d Cir. 2001) ("We have further recognized that a heavy volume of incriminating evidence also can undermine a claim of prejudice." (cleaned up)); *United States v. Rowe*, 906 F.2d 654, 657 (11th Cir. 1990) ("In recognizing the degree of prejudice required and the government's burden to establish harmless error, the strength of the government's case has a bearing on the issue of prejudicial error.").

¶33 Here the strength of the evidence against Marshall was robust. There was no dispute that the heroin found on Marshall after his arrest belonged to him. Nor was there a dispute about the quantity of the heroin or that much of it was already divided into fifteen smaller packages appropriate for individual sale. Moreover, the jury heard evidence that it would be unusual for an individual to purchase a large quantity of heroin with the intent of divvying it up for personal use over seventy days. So even if Marshall's tardiness created a negative impression, there was still overwhelming evidence supporting Marshall's conviction. In other words, it was not his tardiness that convinced the jury to convict him; it was the large amount of heroin neatly packaged for resale that was fatal to Marshall's case. Even if Marshall had shown up early and been a model defendant, we are confident that he still would have been convicted based on the overwhelming evidence arrayed against him.

¶34 Because the evidence overwhelmingly established that Marshall possessed heroin with the intent to distribute it, any harm from the court's flawed decision to proceed in absentia was, under the circumstances of this case, harmless beyond a reasonable doubt.

## II. Sergeant's Testimony

¶35    Marshall's next claim is that Counsel provided ineffective assistance by failing to object to Sergeant's testimony that Marshall possessed the heroin with the intent to distribute it. Marshall argues that this comment "constituted impermissible expert testimony regarding whether the defendant had a mental state or condition that is an element of the charged offense, in violation of rule 704(b) of the Utah Rules of Evidence." *See* Utah R. Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.").

¶36    To prove ineffective assistance of counsel, a defendant must meet the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984): "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. However, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. Thus, because "failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [the defendant's] claims under either prong." *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182. The prejudice prong requires the defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Put another way, "the defendant's showing must undermine our confidence in the outcome." *State v. Gonzalez*, 2021 UT App 135, ¶ 8, 501 P.3d 1205 (cleaned up). Here, because Marshall is not able to demonstrate prejudice, we limit our analysis to the second prong.

¶37     This is the specific piece of testimony Marshall claims should have raised an objection from Counsel: "So this all suggests to me that this individual was in possession of this heroin with the *intent to distribute* because . . . of the different packaging and the different weights." (Emphasis added.) But this was just an isolated phrase in Sergeant's overall testimony, which—even absent the "intent to distribute" statement—clearly demonstrated that the amount of heroin Marshall possessed was not for personal use. *See State v. Prettyman*, 2024 UT App 20, ¶ 38, 544 P.3d 1059 ("[T]he jury had before it multiple sources of evidence it could consider besides [the police officer's] statement that 'it was distribution' indicating that the quantities of drugs [the defendant] possessed were significantly larger than those typically possessed for personal use."), *cert. denied*, 550 P.3d 996 (Utah 2024).

¶38     Sergeant also testified that the nearly seven grams of heroin that Marshall possessed, much of it packaged for individual sale, represented seventy dosage units. Sergeant testified that drug dealers commonly buy in bulk with an eye to sell the contraband in "as small a quantity as possible." He explained, "So if you purchase a large amount and sell it on the street [as] single dosage units, you can upcharge those lower dosage units and make money off of your bulk purchase." Sergeant testified that regular heroin users, on the other hand, would be unlikely to keep a large supply. Instead, Sergeant said, they "only would keep enough on hand to get them high in that moment and sell off as much of the rest as they possibly could." The only reasonable conclusion, based on Sergeant's testimony, is that a seventy-dose supply such as Marshall possessed would be for distribution. The jury members did not need Sergeant to spell it out for them by stating that Marshall had the drugs with the "intent to distribute." The evidence spoke for itself that he was intending to sell his stock. Thus, had Sergeant not uttered the ill-advised phrase "intent to distribute," the jury's conclusion almost

certainly would have been the same based on the overall testimony of Sergeant. Accordingly, Marshall cannot demonstrate a reasonable likelihood of a more favorable outcome even if Counsel had successfully objected to Sergeant's isolated statement.

## CONCLUSION

¶39 The district court conducted an inadequate inquiry to determine whether Marshall was voluntarily absent from trial. But given the overwhelming evidence against him, Marshall was not ultimately prejudiced by this error. And Marshall's ineffective assistance claim regarding witness testimony also fails for lack of prejudice.

¶40 Affirmed.

———————